304 F.3d 950
 US WEST COMMUNICATIONS, INC., a Colorado corporation, Plaintiff-counter-defendant-Appellee,
v.
Renz D. JENNINGS, as a member of the Arizona Corporation Commission; Carl J. Kunasek, as a member of the Arizona Corporation Commission; James M. Irvin, as a member of the Arizona Corporation Commission, Defendants-cross-defendants-Appellees,
American Communications Services, Inc., a Delaware corporation aka espire Communications, Inc., Defendant-counter-claimant-cross-claimant-Appellant.
US West Communications, Inc., a Colorado corporation, Plaintiff-Appellee,
v.
Renz D. Jennings, as a member of the Arizona Corporation Commission; Carl J. Kunasek, as a member of the Arizona Corporation Commission; TCG Phoenix, a general partnership; Arizona Corporation Commission; James M. Irvin, Defendants, and
Brooks Fiber Communications of Tucson, Inc., a Delaware corporation; MCI Telecommunications Corporation, a Delaware corporation; MCImetro Access Transmission Services, Inc., a Delaware corporation; MFS Communications Company, Inc., a Delaware corporation; MFS Intelenet of Arizona, Inc., a Delaware corporation; Worldcom Technologies, Inc., a Delaware corporation, Defendants-Appellants.
US West Communications, Inc., a Colorado corporation, Plaintiff-counter-defendant-Appellee,
v.
Renz D. Jennings, as a member of the Arizona Corporation Commission; Carl J. Kunasek, as a member of the Arizona Corporation Commission; James M. Irvin, as a member of the Arizona Corporation Commission, Defendants-cross-defendants-Appellees,
AT & T Communications of the Mountain States, Defendant-counter-defendant-Appellant,
TCG Phoenix, a general partnership, Defendant-cross-claimant-Appellant,
American Communications Services, Inc., a Delaware corporation aka espire Communications, Inc., Defendant-counter-claimant-cross-claimant-Appellee.
 No. 99-16247.
 No. 99-16264.
 No. 99-16330.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 12, 2000.
 Submission Withdrawn July 27, 2000.
 Resubmitted September 17, 2002.
 Filed September 23, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Timothy J. Berg, Fennemore Craig, Phoenix, AZ, for plaintiff-counter-defendant-appellee US West Communications.
 Michael D. Warden, Sidley & Austin, Washington, DC, for defendants-appellees-cross-appellants TCG Phoenix, AT & T Communications of the Mountain States, Inc.
 Jodie L. Kelley, Jenner & Block, Washington, DC, for defendants-appellees-cross-appellants MCI Telecommunications Corp., MCImetro Access Transmission Services, Inc., Worldcom Technologies, Inc., and Brooks Fiber Communications of Tucson, Inc.
 Michael Patten, Brown & Bain, P.A., Phoenix, AZ, for defendant-appellee-cross-appellant e-spire Communications.
 Daniel M. Waggoner, Davis Wright Tremaine LLP, Seattle, WA, for defendants-appellees-cross-appellants AT & T Wireless Services, Inc.
 Maureen A. Scott, Phoenix, AZ, for defendants-appellees Arizona Corporate Commission.
 Appeal from the United States District Court for the District of Arizona; Owen M. Panner, Senior Judge, Presiding. D.C. No. CV-97-00026-OMP.
 Before GOODWIN, GRABER, and W. FLETCHER, Circuit Judges.
 OPINION
 WILLIAM A. FLETCHER, Circuit Judge.
 
 
 1
 These appeals require us to determine whether various interconnection agreements, arbitrated and approved by the Arizona Corporation Commission ("ACC"), between U.S. West Communications ("US West")[1] and competing telephone companies are consistent with the Telecommunications Act of 1996, Pub.L. 104-104, 100 Stat. 56 ("the Act"), and its implementing regulations. We address the threshold issue of whether Federal Communication Commission ("FCC") regulations that have taken effect after the ACC's decisions are applicable to the interconnection agreements before us, and we conclude below that they are. We then apply those regulations to the terms of the interconnection agreements and address the remaining eleven disputes.
 
 I. Statutory Framework
 
 2
 Providing telephone service requires physically wiring each customer's premises to a network of other customers who also have telephone lines. These networks traditionally have been owned and operated by a single utility, the local telephone company, referred to under the Act as the incumbent local exchange carrier ("ILEC"). The prohibitive cost to potential competitors, referred to under the Act as competitive local exchange carriers ("CLECs"), of laying wire and creating other facilities to support an alternative physical network has stifled competition in local phone markets. The traditional legal approach to this "natural" monopoly has been for states to regulate the ILECs and their rates.
 
 
 3
 The Act was designed to alter this state-supported monopolistic market structure by creating a meaningful potential for competition in the provision of local and long-distance telephone service. To achieve this end, the Act preempts state laws that have the effect of prohibiting competitors' ability to enter the telecommunications market. See 47 U.S.C. § 253(a). The Act further requires, among other things, telecommunications carriers to connect with each other; ILECs to provide requesting CLECs with access to "unbundled network elements" (that is, to discrete components of the existing ILEC network); and ILECs to offer for resale at wholesale rates any telecommunications services that an ILEC sells to its subscribers. See id. § 251(a)-(c). The Act charges the FCC with "establish[ing] regulations to implement the[se] requirements." Id. § 251(d)(1). The FCC accordingly has promulgated various rules that provide access and pricing standards for network elements and retail services.
 
 
 4
 The Act directs the ILECs and CLECs to negotiate in good faith to reach an agreement over the terms of their interconnection. See id. §§ 251(c)(1), 252(a). If an ILEC and a CLEC are unable to agree, the Act provides for binding arbitration conducted under the aegis of a state public utilities commission. See id. § 252(b). Arbitrated interconnection agreements, the only type of agreement at issue in these cases, must meet the requirements of § 251, including the FCC's regulations implementing § 251; set prices for network elements and services pursuant to § 252(d); and provide an implementation schedule. See id. § 252(c). State commissions must formally approve arbitrated agreements, ensuring that they comply with the above requirements. See id. § 252(e). After such approval, any party to the agreement may bring suit in federal district court "to determine whether the agreement ... meets the requirements" of the Act. Id. § 252(e)(6).
 
 II. Procedural History
 
 5
 In Arizona, U.S. West is the ILEC, and the ACC is the state body that regulates telephone service. In the spring of 1996, shortly after the Act was passed, U.S. West began negotiating interconnection agreements with numerous CLEC competitors. Without exception, those negotiations failed, and the parties petitioned the ACC for arbitration. Beginning in late 1996, the ACC arbitrated and approved interconnection agreements among the parties. The ACC issued the last of the relevant arbitration decisions, establishing permanent prices (to replace the interim rates for unbundled loop and network elements set in earlier agreements) based on cost studies, on January 30, 1998. The parties filed separate suits in federal district court in Arizona challenging various portions of the agreements. The cases were consolidated in the district court which, on May 4, 1999, granted summary judgment, upholding some provisions of the agreements and invalidating others. US West timely appealed, and several CLECs timely cross-appealed. US West subsequently dismissed its appeal, so only the CLECs' cross-appeals remain before us.
 
 
 6
 We originally submitted these appeals following oral argument on July 12, 2000. Six days later, the Eighth Circuit Court of Appeals vacated a number of FCC regulations, including certain provisions potentially relevant to the issues on appeal. See Iowa Utils. Bd. v. FCC, 219 F.3d 744 (8th Cir.2000). The Eighth Circuit, in part, (1) vacated 47 C.F.R. § 51.505(b)(1), holding that the FCC's pricing methodology based on the total element long-run incremental cost ("TELRIC") of an element was contrary to § 252(d)(1) to the extent that it was based upon a hypothetical network standard; (2) vacated 47 C.F.R. § 51.609, holding that the "avoided cost" discount for wholesale rates under § 252(d)(3) must be based on actual costs rather than "costs that reasonably can be avoided"; (3) vacated proxy price rules 47 C.F.R. §§ 51.513, 51.611, and 51.707, holding that setting specific prices intrudes on the states' right to set the actual rates pursuant to § 252(c)(2) and that the FCC was estopped from arguing otherwise; (4) vacated 47 C.F.R. § 51.317 (establishing standards under which an ILEC must unbundle or make available network elements), in light of Supreme Court precedent finding parallel standards invalid; and (5) vacated additional combination rule 47 C.F.R. § 51.315(c) through (f), holding that requiring ILECs to combine unbundled network elements was contrary to § 252(c)(3). See id. at 750-51, 755-59. Because the Eighth Circuit is the sole forum for addressing the validity of those FCC rules, see MCI Telecomms. Corp. v. U.S. West Communications, 204 F.3d 1262, 1267 (9th Cir.2000), cert. denied, 531 U.S. 1001, 121 S.Ct. 504, 148 L.Ed.2d 473 (2000), we withdrew these appeals from submission and ordered supplemental briefing on the effect of the Eighth Circuit's decision.
 
 
 7
 The Supreme Court then granted certiorari, limited to certain questions, in the Eighth Circuit case on January 22, 2001. See Verizon Communications, Inc. v. FCC, 531 U.S. 1124, 121 S.Ct. 877, 148 L.Ed.2d 788 (2001). On May 13, 2002, the Supreme Court reversed the Eighth Circuit, holding (1) that the FCC can require state commissions to set rates for network elements based on TELRIC methodology with reference to a hypothetical, most efficient network; and (2) that the FCC can require ILECs to combine unbundled network elements at the request of CLECs who cannot combine such elements themselves. See Verizon Communications, Inc. v. FCC, 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002). The Supreme Court did not address the other issues from the Eighth Circuit's case. Now that the intervening cases have been resolved, we resubmit and decide the appeals before us.
 
 III. Applicable Law
 
 8
 The resolution of several of the issues raised before us depends on whether we should apply FCC regulations implementing the Act that have gone into effect after the ACC arbitrated and approved the interconnection agreements. Because the role of the federal courts is to determine whether the agreements comply with the Act, and because the FCC properly has exercised its authority to implement the Act by means of promulgating regulations, we conclude that we must ensure that the interconnection agreements comply with current FCC regulations, regardless of whether those regulations were in effect when the ACC approved the agreements.
 
 
 9
 Soon after Congress passed the Act, the FCC issued rules implementing the local competition provisions of the Act. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, 11 F.C.C.R. 15499 (released Aug. 8, 1996) ("First Local Competition Order"). Numerous LECs across the country filed suit to challenge the validity of the regulations, and these suits were consolidated before the Eighth Circuit in Iowa Utilities Board v. FCC, 120 F.3d 753 (8th Cir.1997). That court stayed the regulations and later vacated those that, in its view, exceeded the FCC's authority under the Act. See id. at 820. The Supreme Court reversed, in substantial part, the Eighth Circuit's decision and ordered reinstated many of the regulations, including all the FCC's pricing regulations. See AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 385, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). As discussed supra in Part II, the Eighth Circuit later invalidated some of those same rules on the merits, but the Supreme Court again reinstated some of them. Based on the supplemental briefing, it appears that all parties agree that the vacatur of the rules that were not reinstated does not affect resolution of the remaining issues.
 
 
 10
 Some provisions of the interconnection agreements do not comply with the reinstated FCC regulations and with new regulations that the FCC has since issued. The ACC understandably did not consider such regulations when it arbitrated and approved the agreements because they were not in force at that time. Although the Supreme Court had already ordered the FCC regulations reinstated (for the first time) when the district court reviewed the interconnection agreements, the district court did not apply them either. While acknowledging that those FCC regulations were now authoritative statements of the law and that they must be applied to all pending cases, the district court nonetheless declined to do so. It reasoned that the ACC "could not have erred" by failing to follow regulations that were not in effect at the time it rendered its decisions. U.S. West Communications, Inc. v. Jennings, 46 F.Supp.2d 1004, 1009 (D.Ariz.1999). The district court obviously did not apply (nor could it have applied) relevant FCC regulations issued for the first time after its decision. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Third Report and Order, 15 F.C.C.R. 3696 (released Nov. 5, 1999) ("Third Local Competition Order").
 
 
 11
 We review de novo the district court's interpretation of the Act. See U.S. West Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir.1999). Although the district court is correct that the ACC could not have applied FCC regulations not yet in effect, the district court's role under the Act is to determine whether "the agreement or statement meets the requirements of section 251 [and section 252]." 47 U.S.C. § 252(e)(6). The Act gives the FCC authority to establish regulations implementing the Act. See id. § 251(d). Accordingly, the FCC's implementing regulations-including those recently reinstated and those newly promulgated-must be considered part and parcel of the requirements of the Act. They must therefore be given effect in this case, even if the ACC did not err by failing to apply them at the time of its original arbitration decisions.
 
 
 12
 Our reading of the reviewing court's duty under § 252(e)(6) of the Act is consistent with the Supreme Court's general view of a court's duty to apply its new interpretations of law to pending cases. As the Court has explained: "When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." Harper v. Va. Dep't of Taxation, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993); see also Rivers v. Roadway Express, Inc., 511 U.S. 298, 312-13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) (holding that "judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction"). Thus, with respect to the previously vacated pricing rules, the Supreme Court's determination that they are valid means that we should apply those rules to all interconnection agreements arbitrated under the Act, including agreements arbitrated before the rules were reinstated.
 
 
 13
 Contrary to U.S. West's arguments, application of the recently reinstated and newly promulgated regulations will not have an impermissible retroactive effect. The Fourth Circuit reached a similar conclusion in GTE South, Inc. v. Morrison, 199 F.3d 733 (4th Cir.1999), when applying FCC pricing rules reinstated after the state commission had arbitrated agreements. Invoking retroactivity principles from Landgraf v. USI Film Prods., 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Fourth Circuit offered three reasons why application of such rules was permissible. First, the ILEC did not have any vested right to methods contrary to those mandated by the FCC's reinstated rules. See GTE South, 199 F.3d at 741. Second, because the state commission made prospective price determinations, applying the FCC rules to the agreements did not alter past transactions. See id. Third, the ILEC had ample notice of the then-stayed FCC rules prior to the arbitration, and the ILEC was aware of the possibility that, ultimately, they would be reinstated by the Supreme Court. See id. We agree with the Fourth Circuit's cogent retroactivity analysis, and we find that it applies equally to the reinstated regulations at issue here.
 
 
 14
 We recently reached the same conclusion when faced with another FCC regulation that was reinstated both after a state commission had rendered its arbitration decision and after a district court had reviewed that decision. We dismissed retroactivity concerns under a slightly different rationale, holding:
 
 
 15
 This court need not determine whether switched access charges in this case met the requirements of 47 U.S.C. § 252(d)(1), however. That is so because an FCC regulation interpreting the Act now flatly prohibits the inclusion of access charges in the pricing of unbundled network elements. Although temporarily not in effect at the time of the district court's decision, 47 C.F.R. § 51.515(a) has since been reinstated by the Supreme Court.... Because the regulation promulgated by the FCC merely interprets the substantive provisions of the Act, it does not present retroactivity concerns.
 
 
 16
 AT & T Communications Sys. v. Pac. Bell, 203 F.3d 1183, 1187 (9th Cir.2000) (citations omitted) (emphasis added); cf. MFS Intelenet, 193 F.3d at 1123 ("It is irrelevant that U.S. West filed this action with the district court prior to the issuance of the ISP Ruling.... We affirm the district court's decision to include ISP-Bound Traffic in [the challenged interconnection agreement] because the ISP Ruling requires [it]."). Because the Supreme Court has ruled that the reinstated pricing rules in question here effectuate a reasonable interpretation of the Act, see Verizon Communications, 535 U.S. at ___, 122 S.Ct. at 1679, and for the reasons stated above from GTE South, we hold that they do not have an impermissible retroactive effect.
 
 
 17
 We see no reason why the reasoning of GTE South and Pacific Bell should not extend to newly promulgated regulations, such as those in the Third Local Competition Order. As the Fourth Circuit stated in GTE South, the interconnection agreements "govern future business relations among [the ILEC] and its competitors in the local telephone market." 199 F.3d at 741. Thus, as with applying the reinstated rules on review, applying the newly promulgated regulations "will not impose new obligations or duties with respect to past transactions." Id. Accordingly, application of those regulations is not impermissibly retroactive. See Landgraf, 511 U.S. at 273, 114 S.Ct. 1483 ("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive."). Additionally, the newly promulgated regulations in question — governing, for example, access to sub-loops and access to dark fiber — are no less "interpretive" than the regulation at issue in Pacific Bell relating to pricing of switched access charges. Therefore, we also hold pursuant to Pacific Bell that the newly promulgated regulations do not have an impermissible retroactive effect.
 
 
 18
 In sum, we follow the Act's charge to the federal courts to review the agreements for compliance with the Act, rather than for the correctness of the state commission's decisions. Accordingly, we are required to apply all valid, implementing FCC regulations now in effect — including those recently reinstated and those newly promulgated — to the disputed interconnection agreements.[2]
 
 IV. Terms of the Interconnection Agreements
 
 19
 We consider de novo whether the agreements comply with the Act and its implementing regulations, and we consider all other issues under an arbitrary and capricious standard. See MFS Intelenet, 193 F.3d at 1117. The ACC's findings of fact are reviewed for substantial evidence. See MCI Telecomms., 204 F.3d at 1266.
 
 A. Cable Sheath Mileage
 
 20
 CLEC e-Spire contends that the ACC's determination of cable sheath mileage conflicts with TELRIC rate-setting rules and is unsupported by substantial evidence. The choice of which TELRIC pricing model produces the most reliable results falls within the agency's expertise. In its final decision, the ACC set the mileage at 26,092, based on projections from the Hatfield Model 3.1. The fact that the figure is well below the approximately 43,000 cable sheath miles in the existing U.S. West network is consistent with the ACC's position that it properly followed the TELRIC methodology, as required by 47 U.S.C. § 252(d)(1) and 47 C.F.R. § 51.505. Substantial evidence supports the 26,092 mileage figure because it falls within the range of estimates generated during the ACC hearings. We therefore affirm the ACC's cable sheath mileage determination.
 
 B. Four-Wire Loop Price
 
 21
 US West contends that the ACC's four-wire loop price was arbitrary and capricious. The ACC set the price for a two-wire loop at $21.98 and the price for a four-wire loop at $22.90. According to the ACC, U.S. West did not demonstrate that it incurs any additional costs to lay a second two-wire loop at the same time and in the same place as the first two-wire loop, beyond the cost of the additional wire. This finding is supported by testimony from a U.S. West witness, who testified that, in the context of placing multiple drops, the only additional cost was the cost of the additional length of line. US West cites no record evidence to contradict the ACC's determination. We therefore reverse the district court's remand order and affirm the ACC's four-wire loop price.[3]
 
 C. Geographic Deaveraging
 
 22
 The CLECs argue that the interconnection agreements provide for geographically averaged rates for unbundled local loops in violation of 47 C.F.R. § 51.507(f). That regulation, requiring geographic deaveraging of local loop rates, was temporarily stayed until May 1, 2000, and Arizona had received an additional waiver from compliance until June 29, 2000. See In the Matter of Petitions for Waiver of the Section 51.507(f) UNE Deaveraging Requirement, DA 00-956, at ¶¶ 5, 10 (Apr. 28, 2000). Because the deaveraging rules are now in effect, the ACC concedes that the agreements must comply with them. Indeed, on July 25, 2000, the ACC issued a decision establishing interim deaveraged rates based on three zones, as required by the FCC rules. See ACC Decision No. 62753 (July 25, 2000). On June 12, 2002, the ACC established permanent deaveraged rates based on the CLECs' proposal. See In re Qwest, 2002 WL 1803907, at *20. The ACC therefore already has resolved this issue.
 
 D. Conditions on Access to Subloops
 
 23
 MCI disputes the interconnection agreement's conditioning of subloop access on its completion of a formal bona fide request ("BFR") process. At the time the ACC reached its decision, the FCC had declined to specify whether subloops constituted a network element. See First Local Competition Order ¶ 391. In a subsequent order, however, the FCC announced that subloops are network elements. See Third Local Competition Order, at 11. The terms of subloop access therefore must be just, reasonable, and nondiscriminatory. See 47 U.S.C. § 251(c)(3).
 
 
 24
 The parties concede that the BFR process does not meet that standard. The ACC itself states in its brief that, "when the [Third Local Competition] Order takes effect on February 17, 2000, U.S. West will be required to provide MCI and other CLECs with immediate access to unbundled subloops." The Third Local Competition Order, however, also provides that the presumption for immediate access can be rebutted if the ILEC offers to the state commission evidence of technical infeasibility specific to a CLEC's subloop unbundling request. See Third Local Competition Order ¶¶ 223-24. No such evidence with respect to requests for specific subloops is in the record before us. According to its supplemental brief, the ACC set the issue for examination in a procedural order dated August 21, 2000. Because we do not know the current status of those proceedings, we remand to the ACC with instructions to strike the BFR process condition, permit U.S. West an opportunity to submit specific evidence of technical infeasibility, and provide MCI unbundled subloop access pursuant to the Third Local Competition Order, to the extent it has not already done so.
 
 
 25
 E. Reciprocal Access to Poles, Ducts, Conduits, and Rights-of-Way
 
 
 26
 Under the FCC's interpretation of §§ 251(b)(4) and 224 of the Act contained in ¶ 1231 of the First Local Competition Order, the CLECs do not have to grant U.S. West reciprocal access to their poles, ducts, conduits, and rights-of-way. See U.S. West Communications, Inc. v. Hamilton, 224 F.3d 1049, 1055 (9th Cir.2000). We therefore reverse the ACC's and district court's determinations to the contrary.
 
 
 27
 F. Collocation of Remote Switching Units ("RSUs")
 
 
 28
 The interconnection agreement's requirement that U.S. West allow MCI to collocate RSUs on U.S. West's premises is permissible under 47 U.S.C. § 251(c)(6). See Hamilton, 224 F.3d at 1056 (citing MCI Telecomms., 204 F.3d 1262). The FCC's revised collocation rules do not alter this conclusion, as RSUs still meet the new collocation standards. See In the Matter of Deployment of Wireline Servs. Offering Advanced Telecomms. Capability, Fourth Report and Order (released Aug. 8, 2001) ¶¶ 47 & n. 133, 48; MCI Telecomms. Corp. v. Bell Atlantic-Pa., 271 F.3d 491, 519 (3d Cir.2001), petition for cert. filed, 70 U.S.L.W. 3643 (U.S. Apr. 4, 2002) (No. 01-1477).
 
 G. Single Point of Access
 
 29
 The interconnection agreement allows AT & T to interconnect with U.S. West's network at a single point per local access and transport area ("LATA"). The Act requires an ILEC "to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network... at any technically feasible point within the carrier's network." 47 U.S.C. § 251(c)(2)(B).
 
 
 30
 In MFS Intelenet, we explained that provision as follows:
 
 
 31
 The plain language requires local exchange carriers to permit interconnection at any technically feasible point within the carrier's network. An incumbent carrier denying a request for interconnection at a particular point must prove interconnection at that point is not technically feasible. See 47 C.F.R. § 51.305(e).
 
 
 32
 193 F.3d at 1124 (emphasis added). Although we did not address the specific issue of whether a CLEC can demand interconnection at exactly one point per LATA in MFS Intelenet, the quoted text — emphasizing the CLEC's right to connect at any feasible "point"-supports AT & T's right to choose a single point of interconnection. Further, the Third Circuit recently decided the precise question of a CLEC's right to single point interconnection. It reasoned that
 
 
 33
 the fact that § 251(c)(2) permits the CLEC to choose the points in the network at which to interconnect suggests that the Act provides for a balanced resolution in the determination of interconnection points: While the ILEC cannot be required to allow interconnection at technically unfeasible points, similarly the CLEC cannot be required to interconnect at points where it has not requested to do so.
 
 
 34
 Bell Atlantic-Pa., 271 F.3d at 517-18. The court then held that, because there was no evidence that it was technically infeasible for the CLEC to interconnect at only one point per LATA, the CLEC could not be required to interconnect at additional points. See id. We agree with the Third Circuit's holding. Because U.S. West provided no evidence that interconnection at a single point per LATA is technically infeasible, we affirm the ACC's decision to permit AT & T's single point interconnection.
 
 
 35
 Although U.S. West might be correct that it was entitled to additional compensation under 47 U.S.C. § 252(d)(1) for increased costs incurred as a result of the single point interconnection, such increased costs do not bear on the decision to permit AT & T to interconnect at a single point per LATA. See 47 C.F.R. § 51.5 ("A determination of technical feasibility does not include consideration of economic... concerns...."). However, to the extent that AT & T's desired interconnection points prove more expensive to U.S. West, we agree that the ACC should consider shifting costs to AT & T. See Bell-Atlantic Pa., 271 F.3d at 518 (citing 11 F.C.C.R. 15499 ¶ 209 (1996)).
 
 
 36
 We observe that this issue might, in fact, be moot. According to an ACC report issued after oral argument and after supplemental briefing in this case, Qwest and the CLECs reached agreement as to the terms of single point interconnection. See In re U.S. West Communications, Inc., ACC Decision No. 63977, 2001 WL 1285882, at *1 (Aug. 30, 2001) ("Qwest ... has agreed that CLECs may obtain a single point of interconnection in a LATA and pay Qwest TELRIC rates for the exchange of traffic to that single point. Consequently, the parties agree that this issue is no longer at impasse."). We are uncertain whether that agreement applies to the dispute here, because the ACC report discusses the issue in the context of U.S. West's compliance with § 271(c)(2)(B)(xiii) of the Act (requiring reciprocal compensation arrangements in accordance with § 252(d)(2)). We thus condition our holding on a finding by the ACC that the claim is not moot.
 
 H. Tandem Switch Rates
 
 37
 MCImetro asserts that the district court erred in conditioning the ACC's award of tandem rates on MCImetro's entry into an agreement with MCI Telecommunications for access to MCI Telecommunications' long-distance facilities. MCImetro represented to the ACC that it had planned to use the entrance facilities of its long-distance affiliate in order to serve an area geographically comparable to that served by the U.S. West tandem switch. In the MCI arbitration decision, the ACC found that:
 
 
 38
 MCI's switch, in conjunction with the existing facilities of MCI and its long distance affiliate, will be able to terminate calls over a geographic area comparable to or greater than the area covered by U.S. West's tandem switch. As a result, we find it to be just and reasonable for MCI to receive compensation for the use of its switch equivalent to that of U.S. West's tandem switch beginning from the date it enters an agreement granting access to the facilities of its long distance affiliate.
 
 
 39
 In re Petition of MCImetro Access Transmission Servs., Inc., ACC Decision No. 59931, at 24 (Dec. 18, 1996). Until MCImetro entered into such an agreement, it would be compensated at the lower end-office switch rate. See id. Based on the ACC's explanation, we find that its decision was not arbitrary and capricious and that the ACC did not exceed its authority under the Act. We thus affirm the district court.
 
 I. Conditions on Resale of Centrex Services
 
 40
 AT & T challenges the interconnection agreement's restriction that limits the class of customers to whom it may resell Centrex services to those who can purchase the services from U.S. West. The Act requires an ILEC to "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail." 47 U.S.C. § 251(c)(4). The parties agree that Centrex is one such retail service. The Act also prohibits an ILEC from imposing
 
 
 41
 unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.
 
 
 42
 Id. § 251(c)(4)(B). In the First Local Competition Order ¶ 964, the FCC stated that, except for limitations on reselling of residential services to business customers, such "cross-class selling restrictions should be presumed unreasonable" because they "could fetter the emergence of competition." This presumption of unreasonableness, however, can be rebutted if an ILEC "prov[es] to the state commission that the class restriction is reasonable and nondiscriminatory." Id.
 
 
 43
 US West successfully rebutted this presumption. Testimony indicated that allowing the resale of Centrex services to classes of customers other than those to whom U.S. West sells the services would allow CLECs to create their own "mini-networks" and bypass all interconnection charges with U.S. West. Relying on that testimony, the ACC found that the class restriction on Centrex resale was reasonable. Because the restriction permitted AT & T access to the same pool of customers as U.S. West, it was also nondiscriminatory. We therefore find that the ACC's decision was based on substantial evidence and affirm.
 
 
 44
 J. Non-Recurring Charges ("NRCs") for Unbundled Network Elements
 
 
 45
 NRCs compensate U.S. West for the one-time costs it incurs to accommodate a CLEC's request for access to unbundled network elements. The parties correctly agree that NRCs for unbundled network elements normally should be priced using the TELRIC methodology, pursuant to 47 U.S.C. § 252(d)(1) and the reinstated TELRIC-pricing rules. The ACC solicited evidence on the proper TELRIC rates, but concluded that U.S. West's evidence was both untimely and flawed. The ACC concluded that it was unable to develop reasonable TELRIC rates from that evidence. See ACC Decision No. 60635, at 29 (Jan. 30, 1998). Therefore, the ACC adopted the wholesale pricing method (normally reserved for retail services under 47 U.S.C. § 252(d)(3)) as a proxy, pricing the NRCs at U.S. West's tariffed charges, less an 18% wholesale discount. The ACC also invited U.S. West to submit additional TELRIC cost studies if it was dissatisfied with the proxy rates. See id.
 
 
 46
 The district court reversed the ACC's decision and remanded for further rate-setting proceedings, holding that the ACC "must price NRCs on the basis of forward-looking costs without regard to the retail price." 46 F.Supp.2d at 1013. Accordingly, the ACC recently revisited this issue and decided to adopt the forward-looking cost model proposed by the CLECs in order to set new NRC rates for unbundled network elements. See In re Qwest Corp., 2002 WL 1803907, at *21-23. Because the ACC has acted to replace the temporary rates for NRCs based on wholesale pricing with rates based on forward-looking costs, this issue is now moot.
 
 K. Conditions on Access to Dark Fiber
 
 47
 MCI and AT & T object to two conditions that the ACC attached to their access to U.S. West's dark fiber: (1) that they "must establish that another Network Element of comparable expense cannot satisfy their needs"; and (2) that U.S. West may reclaim the dark fiber for its own use or the use of another CLEC if it gives 12 month notice, establishes that it or another carrier needs the fiber, shows that AT & T or MCI has alternatives available at a comparable price and quality, and compensates AT & T or MCI for the cost of conversion.
 
 
 48
 The FCC considers dark fiber to be a "network element." See Third Local Competition Order ¶¶ 174, 325-27. Thus, an ILEC must provide a requesting CLEC unbundled access to dark fiber on "terms[] and conditions" that are "just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(3). Further, the FCC has ruled that CLEC access to dark fiber is always "necessary" under 47 U.S.C. § 251(d)(2), even when CLECs could self-provide or acquire substitutes from third-party providers. See Third Local Competition Order ¶ 165, 332. This decree directly conflicts with the ACC's first "necessity" condition on the CLECs' access to dark fiber; thus, we hold that condition invalid.
 
 
 49
 The Third Local Competition Order permits conditions on a CLEC's dark fiber access only when they "relate to a likely and foreseeable threat to an incumbent LEC's ability to provide service as a carrier of last resort." Id. ¶ 352. We are unable to determine on the current record whether the ACC's second "reclamation" condition on the CLECs' access to dark fiber is sufficiently tailored to protecting U.S. West's ability to serve as a carrier of last resort. We therefore remand to the ACC to give U.S. West an opportunity to provide evidence on its ability to serve as a carrier of last resort and to reassess what reasonable conditions, if any, on the CLECs' access are needed to avoid interference with that duty.
 
 Conclusion
 
 50
 We REVERSE the district court to the extent it held that certain FCC regulations, now in effect but not in effect at the time of the ACC's decisions, do not apply on judicial review of the interconnection agreements. As to the disputed terms of the interconnection agreements, we AFFIRM in part, REVERSE in part, and REMAND to the district court with instructions to remand to the ACC for further proceedings consistent with this opinion.
 
 
 51
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 US West has changed its name to Qwest Corporation since initiating these lawsuits. In this opinion, we continue to call it U.S. West
 
 
 [2]
 Properly promulgated FCC regulations currently in effect must be presumed valid for the purposes of this appeal. The Hobbs Act, 28 U.S.C. § 2342, requires that all challenges to the validity of final orders of the FCC be brought by original petition in a court of appeals. The district court thus lacked jurisdiction to pass on the validity of the FCC regulations, and no question as to their validity can be before us in this appeal
 
 
 [3]
 We note that the ACC recently revisited the pricing of four-wire loops, and adopted the CLECs' new proposal that the four-wire cost be calculated by multiplying the two-wire cost by a factor of 1.3. The ACC observed that "our resolution of this issue is consistent with our conclusion in the First Cost Docket Order [ACC Decision No. 60635] where we determined that the four-wire loop charge [$22.90] should be only 4.2 percent higher than the two-wire loop charge [$21.98]."In re Qwest Corp., ACC Decision No. 64922, 2002 WL 1803907, at *45 (June 12, 2002).