889 So.2d 712 (2004)
VERIZON FLORIDA, INC., Appellant/Cross-Appellee,
v.
Lila A. JABER, et al., Appellees/Cross-Appellees/Cross-Appellant.
No. SC02-2647.
Supreme Court of Florida.
September 2, 2004.
Rehearing Denied December 8, 2004.
*713 Marvin E. Barkin and Marie Tomassi of Trenam, Kemker, Scharf, Barkin, Frye, O'Neill and Mullis, St. Petersburg, FL; and Kimberly Caswell, Tampa, FL, on behalf of Verizon Florida, Inc., for Appellant/Cross-Appellee.
Harold McLean, General Counsel, and David Smith, Attorney Supervisor, Tallahassee, FL, on behalf of Florida Public Service Commission, for Appellee/Cross-Appellee.
Floyd Self and Norman H. Horton, Jr. of Messer, Caparello and Self, P.A., Tallahassee, and Tracy W. Hatch on behalf of AT & T Communications of the Southern States, LLC, Tallahassee, FL, for Appellee/Cross-Appellant.
PER CURIAM.
We have on appeal a decision of the Florida Public Service Commission relating to rates or service of a telephone utility. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. For the reasons expressed below, we affirm the Commission's order.

PROCEEDINGS TO DATE
The 1996 Federal Telecommunications Act established regulations and guidelines designed to expand entry into and increase competition in the telecommunications market. One of the provisions of the Act provides for large telecommunications companies such as Verizon, categorized as incumbent local exchange carriers (ILECs), to lease portions of their networks to smaller companies known as alternative local exchange carriers (ALECs). These portions, such as switching devices *714 and loops, are collectively referred to as unbundled network elements, or UNEs.
The Eleventh Circuit has described these unbundled network elements by analogy:
To use a simple analogy, the unbundled access provision is akin to requiring one car manufacturer to sell a competitor access not to one of its completed vehicles, but to the individual elements of the vehicle, such as the engine, radiator, and tires, all of which the manufacturer has unbundled, or segregated out, for the competitor's convenience.
AT & T Communications of the S. States, Inc. v. BellSouth Telecomms., Inc., 268 F.3d 1294, 1297 (11th Cir.2001). Florida's statutory regulatory scheme provides that when the incumbent carriers and alternative carriers cannot agree on an appropriate rate for the incumbents to lease UNEs to the alternative carriers, the Commission will set UNE rates. See § 364.161(1), Fla. Stat. (2002).
On May 26, 1999, the Commission opened a UNE pricing docket for three major incumbent carriers: BellSouth Telecommunications, Inc. (BellSouth), Sprint-Florida Inc. (Sprint), and GTE Florida, Inc., (now known as Verizon), in order to determine an appropriate rate. BellSouth's proceedings were bifurcated from Verizon and Sprint's proceedings and were resolved in Phase II of the docket, while Verizon and Sprint's proceedings were resolved later in Phase III. Evidentiary hearings related to the Sprint and Verizon UNE issues were held on April 29-30, 2002. The following parties participated in the evidentiary hearing: Verizon Florida, Inc.; Sprint-Florida, Inc.; AT & T Communications of the Southern States, LLC; KIM Telecom; WorldCom, Inc.; Florida Digital Network, Inc.; Z-Tel Communications, Inc.; Covad; and the Commission's staff. At these hearings, Verizon presented a specially designed ICM-FL model in support of its UNE pricing. At an October 2002 special agenda conference, the Commission determined that the setting of rates for Sprint needed to be delayed pending further staff research. However, the Commission proceeded with setting Verizon's UNE rates, and on November 15, 2002, the Commission issued its Final Order on Rates for Unbundled Network Elements Provided by Verizon Florida (PSC-02-1574-FOF-TP). Verizon now appeals the Commission's order and AT & T cross-appeals.

ANALYSIS
We begin our analysis by noting the applicable standard of review: "[O]rders of the Commission come before this Court clothed with the statutory presumption that they have been made within the Commission's jurisdiction and powers, and that they are reasonable and just and such as ought to have been made." GTC, Inc. v. Garcia, 791 So.2d 452, 456 (Fla.2000) (quoting United Tel. Co. v. Public Serv. Comm'n, 496 So.2d 116, 118 (Fla.1986)). "The party challenging an order of the Commission bears the burden of overcoming those presumptions by showing a departure from the essential requirements of law. We will approve the Commission's findings and conclusions if they are based on competent substantial evidence, and if they are not clearly erroneous." Gulf Coast Elec. Co-op., Inc. v. Johnson, 727 So.2d 259, 262 (Fla.1999) (footnote omitted).[1]

*715 Verizon's Appeal
Verizon raises four issues: (1) whether the Commission's cost of capital allocations are supported by competent, substantial evidence; (2) whether the Commission's depreciation allocations are supported by competent, substantial evidence; (3) whether the Commission's adjustments to Verizon's loading factors were reasonable and supported by the record; and (4) whether certain other calculations made by the Commission were proper.

Cost of Capital
In its first issue, Verizon challenges the Commission's allocation for the cost of the equity component of Verizon's cost of capital. Verizon asserts that the Commission's cost of equity allocation is erroneous because in setting the cost, the Commission relied on a proxy group that excluded telecommunications company SBC Communications, and included AT & T and CenturyTel. Verizon asserts that SBC Communications fit the applicable criteria for proper inclusion in the proxy group, while AT & T and CenturyTel did not because at the time of the rate-setting proceedings, they were involved in mergers. Verizon contends that the pendency of the merger issue rendered the current financial status of these companies unreliable for use in calculating reasonable rates. The Commission addressed this contention in detail in its Order:
The selection of an appropriate proxy group is difficult because there are no publicly-traded companies whose sole business is the provision of unbundled network elements. Further, witness VanderWeide acknowledges that the provision of unbundled network elements is more capital intensive than many of the industries in his proxy group. The companies witness Draper uses are considered telecommunications companies by Value Line. Witness Draper's companies receive at least 75% of their revenue from the provision of telecommunications services, though not necessarily local exchange service. Witness Draper's index of companies is a reasonable proxy group for determining the cost of equity related to UNEs.
In re Investigation into Pricing of Unbundled Network Elements (Spring/Verizon Track), Docket No. 990649B-TP, Order No. PSC-02-1574-FOF-TP at 83 (Fla.P.S.C. Nov. 15, 2002). On the record before us, we find no error in the Commission's analysis and resolution of this issue.
At the evidentiary hearing, four witnesses testified regarding the cost of equity: (1) Verizon witness VanderWeide, (2) staff witness Draper, (3) Z-Tel witness Ford, and (4) ALEC Coalition witness Ankum. Each witness estimated the cost of equity by applying a particular model or models. Applying the DCF model, witness VanderWeide estimated the cost of equity to be 14.75%. Staff witness Draper calculated the cost of equity to be 11.45% using the DCF model and 11.02% using the CAPM model, for an average of 11.24%. Z-Tel witness Ford used the CAPM model and calculated the cost of equity to be 10.0-10.1%. ALEC Coalition *716 witness Ankum did not provide a specific cost of equity analysis. The Commission focused on the testimony of the three witnesses that actually provided substantive testimony and calculations of the cost of equity.
The Commission determined that staff witness Draper's estimate of 11.24% was the most appropriate cost of equity calculation, and it based this determination on the fact that Draper's calculation utilized features of both of the other experts' models. We conclude that choosing the option which engaged both cost of equity models was both reasonable and within the Commission's discretion. Furthermore, the 11.24% cost of equity selected falls between the range of 10.0% and 14.75% presented by the witnesses. While acknowledging Verizon's disagreement with this reasoning, we defer to the Commission's expertise on this issue, and conclude that competent, substantial evidence supports the Commission's conclusions since its findings fall between the cost of equity estimates offered by the witnesses, and expert witness Draper's testimony provided a sufficient evidentiary basis for the Commission's conclusion.

Depreciation
Verizon also contends that the depreciation inputs which the Commission utilized to calculate the UNE rates were erroneous. Depreciation refers to the period of time during which an object has effective usefulness and utility. At the evidentiary hearing, Verizon witness Sovereign and ALEC Coalition witness Ankum testified regarding the depreciation lives which should be used in calculating the UNE rates. Ankum recommended that the Commission apply the FCC-approved rates, but suggested as an alternative that the Commission "adopt the lives approved for BellSouth in the earlier phase of this proceeding since they are relatively close to those approved by the FCC." In its Order, the Commission expressed some distress in resolving this issue:
We are in a quandary regarding depreciation inputs. On one hand, Verizon has not provided sufficient evidence that its proposed inputs are appropriate. Indeed, Verizon only offered support regarding the economic lives of the technology-sensitive accounts. On the other hand, we are hesitant to rely solely on the FCC-approved life and salvage ranges as proposed by the ALEC Coalition. On balance, we believe the ALEC Coalition's alternative proposal, to use the depreciation inputs approved for BellSouth by Order No. PSC-01-1181-FOF-TP, represents a good compromise.
Id., order at 75. Although the outright adoption of BellSouth's depreciation rates could be troublesome, we note that expert witness testimony in the record expressly provides an evidentiary basis and establishes the reliability of the adoption of BellSouth's depreciation lives as an alternative which the Commission could choose. Furthermore, the Commission articulated valid concerns with the other options presented, including a lack of sufficient information provided by Verizon. Accordingly, we conclude that the depreciation inputs used by the Commission were not arbitrarily selected, and are supported by competent, substantial evidence in the record.

Loading Factors
Verizon also argues that the Commission arbitrarily adjusted the loading factors in the ICM-FL model, having incorrectly perceived a linearity problem in Verizon's loading factors calculations. However, we conclude that the loading factors were properly adjusted by the Commission following its analysis of the *717 evidence and a determination that certain adjustments needed to occur to avoid distorted costs. The Commission found that Verizon's material and engineering loading factors were linear, meaning that they did not take into account the size or type of cable involved. From the record it appears that failure to take into account the size or type of cable can result in distorted costs between areas. The Commission concluded that it needed to make adjustments to the loading factors presented by Verizon to compensate for this problem. To remedy the problem, the Commission adjusted those loading factors that appeared to be outliers when compared with those approved for BellSouth in Order No. PSC-01-1181-FOC-TP. We note the Commission's discussion of this issue in its order:
While rates clearly must be based on TELRIC costs to be compliant with the FCC's rules, that fact does not speak against comparing the rates of similarly situated companies in the same state. We agree with Verizon that rates set in other states may not provide a reasonable benchmark. However, rates set in the same state by the same commission may provide a gauge by which to measure whether the rates proposed by a company, in this case Verizon, are so totally beyond the realm of reason that they must be rejected. Caution must be exercised to make sure the rates include similar factors. Once it can be ascertained that the rates have been calculated in a similar fashion, there is no reason why such comparisons cannot prove useful.
Id., order at 17. Verizon contends that the reliance on the BellSouth proceeding was erroneous. However, since the Commission had only recently engaged in the process of determining UNE rates for BellSouth, another ILEC, it stands to reason that the process would have informed and enlightened the Commission in their setting of Verizon's rates. We find no error in the use of some comparison between BellSouth and Verizon in order to ensure some consistency of UNE rates between similarly situated ILECs in Florida.
Furthermore, we find Verizon's contention that the Commission's adjustments were not based on evidence in the record is without merit. In its recommendation, the Commission staff cited to specific Verizon exhibits which raised staff's concern about the linearity problem. Therefore, we conclude that the Commission's decisions were based on a review of the available evidence. The resulting adjustments were within the Commission's discretion, as it is vested with the broad responsibility of setting rates. See Gulf Coast Elec. Co-op., Inc. v. Johnson, 727 So.2d 259, 262 (Fla.1999). Therefore, we affirm the Commission's decision with respect to Verizon's loading factors.

Calculation Errors
Verizon also contends that the Commission made certain calculation errors that need to be remedied. Specifically, Verizon challenges the (1) calculation of the common cost allocator and (2) computation of UNE-P rates. We conclude that these challenges are largely based on speculation and extra-record evidence, and are not properly before this Court. It is not the job of this Court to recalculate rates and costs, but only to determine whether competent, substantial evidence supported the Commission's decisions on such calculations. See GTC, Inc., 791 So.2d at 456.
Further we note that the Commission has set up an appropriate procedure for challenging the Commission's alleged computational errors. Under this procedure, Verizon could have filed a motion for reconsideration pinpointing the alleged erroneous calculations following the issuance of *718 the Commission's final order. In relevant part, the applicable section of Florida's Administrative Code states: "Any party to a proceeding who is adversely affected by an order of the Commission may file a motion for reconsideration of that order." Fla. Admin. Code Ann. R. 25-22.060(1)(a). To an extent, Verizon is attempting to place this Court in the position of the Commission to recalculate data and reweigh evidence, rather than framing a legal issue that this Court can address. In any case, we reject this claim as a claim based upon lack of competent, substantial evidence to support the Commission's findings.[2]

AT & T's Cross-Appeal
AT & T raises two issues on cross-appeal: (1) whether the Commission's order on cost of capital, depreciation, and loading factors is based on the record; (2) whether the ICM-FL cost model utilized by Verizon is TELRIC-compliant. We have already addressed the first issue and find it without merit.

Verizon's ICM-FL Model
AT & T challenges the ICM-FL model designed by Verizon and largely adopted by the Commission for calculating Verizon's UNE rates. The appropriate methodology for establishing UNE rates is set forth at 47 C.F.R. § 51.505 (2003). This regulation sets forth the Total Element Long-Run Incremental Cost, or TELRIC methodology. The TELRIC methodology computes the cost of a UNE by adding up an ILEC's long-term forward-looking costs of providing the network element. See 47 C.F.R. § 51.505(b).[3]
AT & T contends that Verizon's ICM-FL study is not TELRIC compliant for two reasons: (1) the study utilizes GTD-5 switches rather than what AT & T perceives as the more efficient ATM switches, and (2) the study improperly includes inputs for digital loop carrier (DLC) technology, which allows for Verizon's recoupment of embedded costs, in violation of § 51.505(d)(1), which expressly prohibits a cost model from incorporating embedded costs.
In reviewing the ICM-FL model for TELRIC compliance, we note that the assessment of TELRIC compliance "is not a legal determination, but a factual determination made by weighing the evidence." Illinois Bell Tel. Co. v. Wright, 245 F. Supp 2d. 900, 908 (N.D.Ill.2003).

GTD-5 switches:
AT & T argues that the incorporation of GTD-5 switching technology in *719 the ICM-FL model was inappropriate because it does not represent the most efficient switching technology available. However, we conclude that competent, substantial evidence supports the Commission's conclusion that the incorporation of GTD-5 switches was appropriate and that their utilization in the model satisfied TELRIC standards. Previously advanced at the hearing by the ALEC Coalition, the Commission addresses this identical TELRIC challenge in detail in its order:
Although we acknowledge that the record indicates that the GTD-5 switch is not used by any other ILEC, we do not agree with the Coalition's assertion that the GTD-5's inclusion in Verizon's cost study violates TELRIC principles. The fact that Verizon does not use the GTD-5 switch in areas other than former GTE territories, and that no other ILECs use the GTD-5 switch, are not indicative, in and of themselves, of a non-TELRIC compliant switch cost study.
Furthermore, the Coalition's assertion that we found that the GTD-5 switch "was not forward-looking technology" in Order No. PSC-99-0068-FOC-TP needs to be put in context. Verizon witness Tucek agrees that the Order excluded the GTD-5 switch, but adds that it was because we "did not feel it was representative of costs that would be suitable for generic costs in the USF docket." Verizon witness Tucek's belief that we "never determined that the GTD-5 switch was not representative of Verizon's costs  the only costs that are at issue in this proceeding" is correct. What differentiates between the USF docket and the present proceeding is that the USF docket was a generic proceeding where the outcome was applicable to every ILEC. In the current proceeding, the decision from the Verizon track will be applicable to Verizon alone.
Verizon's assumptions and inputs as they relate to the GTD-5 and other switches included in its switching model appear to be reasonable, and are indicative of a forward-looking, TELRIC compliant cost study. Although the GTD-5 may not be a forward-looking technology for other LECs, based on the record here we believe that the GTD-5 appears to be a forward-looking, economically efficient technology for Verizon-Florida. Verizon has indicated throughout the record that it intends to purchase additional GTD-5 switches, albeit as remotes, and has no plans to discontinue the use of the GTD-5 in its network. The ALEC Coalition admits the same, but adds that Verizon is only doing so to ensure host switch compatibility. As such, we believe the inclusion of the GTD-5 switch in the determination of switch costs does not appear to violate TELRIC.
In re Investigation into Pricing of Unbundled Network Elements, order at 143. Although AT & T invites this Court to reweigh the evidence and determine that the GTD-5 switch is not "forward-looking" and violates TELRIC standards, we conclude the Commission's determination that the GTD-5 switch satisfies the necessary criteria is essentially a finding of fact that will not be disturbed unless clearly erroneous. The Commission heard extensive witness testimony from both Verizon and the ALEC Coalition, and having weighed the evidence presented, determined that the use of the GTD-5 switch was adequately forward-looking and TELRIC compliant. Therefore, AT & T has not satisfied the burden of proving that the Commission's decision to allow the incorporation of the GTD-5 switch was clearly erroneous.

DLC Technology:
AT & T's next argument that ICM-FL is not TELRIC compliant revolves around *720 the study's use of digital loop carrier (DLC) technology. AT & T contends that the incorporation of DLC technology reflects an embedded cost, which federal regulations expressly prohibit.[4] Additionally, the U.S. Supreme Court has weighed in on the issue, finding that TELRIC's exclusion of embedded costs was an appropriate method of establishing rates. See Verizon Communications, Inc. v. F.C.C., 535 U.S. 467, 523, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002) (holding that requirement that rates set by state utility commissions be forward-looking and exclude embedded costs was proper). The Commission's order contains the following pointed discussion regarding the inclusion of DLC technology:
Prior to the Supreme Court's decision witness Tucek's view was supported by the Eighth Circuit's decision; we believe this is no longer the case, and question whether on balance it can be concluded that ICM-FL yields costs based on "the most efficient telecommunications technology currently available and the lowest cost network configuration, ..." (§ 51.505(b)(1)) Although we have concerns as to the extent to which it approximates its current network in some respects, we believe that ICM-FL should nevertheless be accepted as the basis for setting UNE rates for Verizon in this proceeding, for the following reasons. First, there is no viable alternative basis upon which rates can be set. To completely reject Verizon's model would require Verizon to refile studies at a future time, using a modified model; however, there is little meaningful record support for what specific refinements should be made. Second, we take some comfort that ICM-FL does not fully replicate Verizon's existing network, in that it models fewer sheath feet of cable than currently exist. Third, due to the various modifications to Verizon's model inputs approved in other sections of this Order, we believe that the rates yielded by ICM-FL on balance are reasonable. Accordingly, we find that the network design reflected in ICM-FL shall be accepted for purposes of establishing recurring UNE rates in this proceeding, subject to our adjustments in other sections of this Order.
In re Investigation into Pricing of Unbundled Network Elements, order at 67-68. We emphasize that the Commission's statutory mandate is the establishment of reasonable rates, and on this record we conclude that the Commission's adoption of the ICM-FL model is acceptable. See 47 C.F.R. § 51.505; § 364.01(4)(a), Fla. Stat. (2002).
As the Commission points out on appeal, the amount of sheath feet in a proposed cost study relative to the amount of existing cable has been viewed as a factor in determining whether a study is TELRIC compliant. In US West Communications, Inc. v. Jennings, 304 F.3d 950 (9th Cir.2002), the Ninth Circuit found persuasive the fact that the model did not totally replicate the existing network because the model contained fewer sheath feet of cable than the existing network. See id. at 959. We conclude that the sheath feet accommodation, combined with the Commission's other prophylactic adjustments to the ICM-FL model, adequately *721 support the Commission's decision that the ICM-FL model is an appropriate model for UNE rate-setting. AT & T cites no case law that supports its proposition that TELRIC standards be viewed and applied so rigidly as to invalidate an entire rate-setting model on the grounds of such an alleged flaw, particularly where measures have been taken to remedy the effects.

CONCLUSION
In conclusion, having determined that competent, substantial evidence supported the Commission's decisions and that the Commission has acted within the bounds of its authority and discretion, we affirm the Commission's order.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO and BELL, JJ., concur.
NOTES
[1] This Court explained the term "competent substantial evidence" in DeGroot v. Sheffield, 95 So.2d 912, 916 (Fla.1957) (citations omitted):

We have used the term "competent substantial evidence" advisedly. Substantial evidence has been described as such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred. We have stated it to be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. In employing the adjective "competent" to modify the word "substantial," we are aware of the familiar rule that in administrative proceedings the formalities in the introduction of testimony common to the courts of justice are not strictly employed. We are of the view, however, that the evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. To this extent the "substantial" evidence should also be "competent."
[2] We also conclude that Verizon's letter sent in response to the Commission's staff recommendations was properly excluded from the record upon which the Commission based its decisions.
[3] Subsection b of the regulation defines TELRIC as follows:

(b) Total element long-run incremental cost. The total element long-run incremental cost of an element is the forward-looking cost over the long run of the total quantity of the facilities and functions that are directly attributable to, or reasonably identifiable as incremental to, such element, calculated taking as a given the incumbent LEC's provision of other elements.
(1) Efficient network configuration. The total element long-run incremental cost of an element should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers.
(2) Forward-looking cost of capital. The forward-looking cost of capital shall be used in calculating the total element long-run incremental cost of an element.
(3) Depreciation rates. The depreciation rates used in calculating forward-looking economic costs of elements shall be economic depreciation rates.
[4] 47 C.F.R. § 51.505(d)(1) states the following with respect to embedded costs:

(d) Factors that may not be considered. The following factors shall not be considered in a calculation of the forward-looking economic cost of an element:
(1) Embedded costs. Embedded costs are the costs that the incumbent LEC incurred in the past and that are recorded in the incumbent LEC's books of accounts.