791 So.2d 452 (2000)
GTC, INC., Appellant, Cross-Appellee,
v.
Joe GARCIA, etc., et al., Appellees, Cross-Appellants.
No. SC94656.
Supreme Court of Florida.
November 16, 2000.
Rehearings Denied February 22 and May 15, 2001.
*453 Patrick Knight Wiggins and Susan Davis Morley of Wiggins & Villacorta, P.A., Tallahassee, Florida, for Appellant, Cross-Appellee.
Robert D. Vandiver, General Counsel, David E. Smith, Director of Appeals, and Christiana T. Moore, Associate General Counsel, Florida Public Service Commission, Tallahassee, Florida; and Raoul G. Cantero, III and Jeffrey W. Blacher of Adorno & Zeder, P.A., Miami, Florida, BellSouth Telecommunications, Inc., Miami, Florida, for Appellees, Cross-Appellants.
PER CURIAM.
GTC, Inc. appeals an order of the Public Service Commission ("Commission") concerning the termination of an interLATA access subsidy that GTC had been receiving since 1985 from BellSouth Telecommunications, Inc. ("BellSouth"). BellSouth cross-appeals the PSC's decision requiring it to reduce its rates due to the elimination of the subsidy. We have jurisdiction pursuant to article V, section 3(b)(2) of the Florida Constitution. For the following reasons, we affirm the Commission's decision to terminate the interLATA subsidy, but we reverse the Commission's decision requiring BellSouth to reduce its rates.

BACKGROUND
GTC is a local exchange carrier in Port St. Joe, Florida. In the early to mid 1980s, the Commission established a system of uniform statewide access charges for calls between Florida local access transport areas ("LATAs"),[1] whereby interexchange carriers ("IXCs") had to compensate local exchange carriers ("LECs") for toll calls originating or terminating in the LEC network. Under this system, the LECs' access revenues and expenses were pooled and the profit was divided among the member LECs. In 1985, the Commission issued an order which created an interLATA access subsidy to aid in the transition from a system of pooling access revenues to a "bill and keep" system whereby each LEC would retain the revenues it received for use of its facilities. See In re Intrastate access charges for toll use of local exchange services, 85 F.P.S.C. 6:69 (1985) (Docket No. 820537-TP; Order No. 14452, June 10, 1985) [hereinafter "Order No. 14452"].[2] Although the Commission *454 believed that the "bill and keep" system would better compensate the LECs for use of their facilities and promote competition, it recognized that immediate implementation of the new policy could not be achieved because some LECs would suffer a loss under the new system. Accordingly, the Commission created a temporary access subsidy pool, the purpose of which was to "keep each company in the same financial position it would have been in prior to implementing bill and keep." Order No. 14452 at 11. The Commission stressed, however, that the subsidy pool was a temporary mechanism to prevent any LEC from suffering a shortfall due to the new system. See id.
Under the subsidy pooling system, seven LECs contributed a portion of the revenues collected from the interLATA access charge into a pool.[3] The pooled amount was then divided among six LECs in the form of a subsidy payment.[4] As of July 1, 1995, only BellSouth as a contributing LEC and GTC as a receiving LEC remained in the interLATA subsidy pool.
In 1995, the Legislature substantially altered the telecommunications statute and enacted section 364.051, Florida Statutes (1995) relating to price regulation of local exchange telecommunications companies. See ch. 95-403, § 9, Laws of Fla. Under the provisions of section 364.051, LECs may opt to cap their rates for basic service. If the company elects price regulation, the statute expressly states that such companies shall be exempt from rate base, rate of return regulation, and the requirements in several enumerated statutes. The statute states in pertinent part:
(1) SCHEDULE.Notwithstanding any other provisions of this chapter, the following local exchange telecommunications companies shall become subject to the price regulation described in this section on the following dates:
(a) For a local exchange telecommunications company with 100,000 or more access lines in service as of July 1, 1995, such company may file with the commission a notice of election to be under price regulation effective January 1, 1996, or when an alternative local exchange telecommunications company is certificated to provide local exchange telecommunications services in its service territory, whichever is later.
(b) Effective on the date of filing its election with the commission, but no sooner than January 1, 1996, any local exchange telecommunications company with fewer than 100,000 access lines in service on July 1, 1995, that elects pursuant *455 to s. 364.052 to become subject to this section.
(c) Each company subject to this section shall be exempt from rate base, rate of return regulation and the requirements of ss. 364.03, 364.035, 364.037, 364.05, 364.055, 364.14, 364.17, and 364.18.

(2) BASIC LOCAL TELECOMMUNICATIONS SERVICE.Price regulation of basic local telecommunications service shall consist of the following:
(a) Effective January 1, 1996, the rates for basic local telecommunications service of each company subject to this section shall be capped at the rates in effect on July 1, 1995, and such rates shall not be increased prior to January 1, 1999. However, the basic local telecommunications service rates of a local exchange telecommunications company with more than 3 million basic local telecommunications service access lines in service on July 1, 1995, shall not be increased prior to January 1, 2001.
(b) Upon the date of filing its election with the commission, the rates for basic local telecommunications service of a company that elects to become subject to this section shall be capped at the rates in effect on that date and shall remain capped as stated in paragraph (a).
§ 364.051(1)-(2), Fla. Stat. (1995) (emphasis added). On June 25, 1996, GTC notified the Commission of its decision to elect price regulation under section 364.051. BellSouth had also elected price regulation. On July 1, 1997, BellSouth filed a petition with the Commission to terminate the interLATA access subsidy received by GTC.
At a hearing held May 20, 1998, several expert witnesses testified. The witnesses agreed that the interLATA access subsidy was intended to be temporary and that the subsidy to GTC should be eliminated. They also agreed that the Commission has the authority to discontinue the subsidy payments due to the fact that it created the subsidy pool. However, the witnesses disagreed as to what criteria should be used in determining whether to eliminate GTC's subsidy. The witnesses further disagreed as to the Commission's authority to reduce BellSouth's rates if the subsidy is discontinued. Finally, the parties disagreed as to whether BellSouth's prior rate reductions relieve it from further rate reductions if the subsidy payments to GTC are eliminated. In essence, the witness for BellSouth testified that the Commission does not have the authority to require BellSouth to reduce its rates, and even if it did, BellSouth has reduced its rates in the past in an amount exceeding the subsidy payment to GTC. Therefore, no further rate reductions are necessary; BellSouth will not obtain any windfall by the discontinuance of the subsidy payment to GTC. No testimony or evidence was presented during the hearing as to GTC's earnings or whether it was currently over-earning.
Based on the testimony submitted, the Commission found that the interLATA access subsidy was a temporary mechanism created to ease the transition from the pooling system to a bill and keep system. See In re Petition of BellSouth Telecommunications, Inc. to remove interLATA access subsidy received by St. Joseph Telephone & Telegraph Co., 98 F.P.S.C. 8:470 (1998) (Docket No. 970808; Order no. PSC-98-1169-FOF-TL, Aug. 28, 1998) [hereinafter "Order No. PSC-98-1169-FOF-TL"]. It further found that its prior orders relied on the company's earnings status as the means for discontinuing the access subsidy. See id. at 6. The Commission acknowledged that in those cases, the companies operated under the rate of return regulation and GTC is now price-cap *456 regulated. See id. Nevertheless, the Commission concluded that the access subsidy was "clearly intended" only as a temporary mechanism that "was to last only until a company experienced some change in circumstances that [it] found justified terminating the subsidy." Id. Accordingly, it stated that the "changed circumstances" should continue to be the criterion for determining whether a subsidy should be eliminated. See id.
As for GTC's entitlement to a continued access subsidy, the Commission concluded that the fact GTC's rates are frozen under price-cap regulation does not alter its ability to terminate the subsidy. It stated: "Based on the evidence and arguments presented, we find that we have the authority to eliminate the subsidy payment to GTC by virtue of our original authority to establish the subsidy." Id. at 8. The Commission noted that under section 364.051(5),[5] GTC may petition the Commission for an increase in rates if it believes that circumstances have changed substantially to justify the increase. See Order No. PSC-98-1169-FOF-TL at 12.
As for BellSouth, the Commission concluded that because BellSouth no longer has to pay a subsidy to GTC, it must reduce its rates to avoid a "windfall." See id. at 17. In so concluding, the Commission expressly rejected BellSouth's argument that because it has reduced its rates in the past it is relieved from further rate. reductions. See id. at 16.

APPEAL
On appeal, GTC argues that the Commission exceeded its scope of authority in terminating the interLATA subsidy and requiring a rate reduction by BellSouth. It contends that the access subsidy was established while it operated under a rate of return regulatory scheme. In contrast, under price-cap regulation, local exchange carriers who opted for price-cap regulation have agreed to freeze their basic local rates and in exchange therefor are free from further rate of return regulation. GTC contends that by electing to operate under section 364.051, GTC is no longer subject to the rules of rate of return regulation and, therefore, the Commission lacks the authority to eliminate the subsidy.
Both BellSouth and the Commission argue, on the other hand, that the subsidy was intended to be temporary. The Commission argues further that neither the statutes nor the legislative history to the statutes guarantee GTC the revenues it was receiving at the time it elected price-cap regulation. Moreover, the Commission maintains that section 364.01(3) grants it regulatory oversight to promote the development of fair and effective competition, and thus it has the authority to terminate the subsidy.
We begin our analysis by recognizing the well-established rule that "orders of the Commission come before this Court clothed with the statutory presumption that they have been made within the Commission's jurisdiction and powers, and that they are reasonable and just and such as ought to have been made." United Telephone Co. v. Public Service Comm'n, *457 496 So.2d 116, 118 (Fla.1986) (quoting General Telephone Co. v. Carter, 115 So.2d 554, 556 (Fla.1959)); see also BellSouth Telecommunications, Inc. v. Johnson, 708 So.2d 594, 596 (Fla.1998); Ameristeel Corp. v. Clark, 691 So.2d 473, 477 (Fla. 1997). Such deference may not be accorded where the Commission exceeds its statutory authority. See United Telephone Co., 496 So.2d at 118; see also Florida Interexchange Carriers Ass'n v. Beard, 624 So.2d 248, 251 (Fla.1993). In this case, however, we find the Commission acted within the scope of its powers and jurisdiction in eliminating GTC's inter-LATA subsidy.
In its final order, the Commission explains that it has authority to eliminate the subsidy payment to GTC "by virtue of our original authority to establish the subsidy." Order No. PSC-98-1169-FOF-TL at 8. The Commission reasoned further that:
Elimination of the subsidy payment to GTC does not conflict in any way with Section 364.051, Florida Statutes. The evidence does not suggest that the enactment of the Florida Telecommunications Act of 1995 impaired our authority to implement and enforce our prior, lawfully enacted orders regarding the subsidy.... The fact that GTC is now price regulated does not alter our authority with regard to this subsidy, which was implemented prior to GTC's election of price regulation.
Id. GTC argues, however, that section 364.051 precludes the Commission from eliminating the subsidy.
As noted above, section 364.051(1)(c) expressly exempts companies who elect to be price regulated from rate of return regulation: "Each company subject to this section shall be exempt from rate base, rate of return regulation and the requirements of ss. 364.03, 364.035, 364.037, 364.05, 364.055, 364.14, 364.17, and 364.18." Section 364.03, Florida Statutes (1995), provides that rates must be "fair, just, reasonable, and sufficient." Section 364.035, Florida Statutes (1995), gives the Commission the authority to fix rates and guarantees to telecommunication companies a reasonable rate of return on their rates. Section 364.037, Florida Statutes (1995), requires the Commission to consider revenues derived from advertising in telephone directories in setting rates. Sections 364.05 and 364.055, Florida Statutes (1995), grant the Commission authority to change any rates, tolls, rentals, contracts, or charges by a telecommunication company or to permit the collection of an interim rate during the pendency of the rate change proceedings. Section 364.14 permits the Commission to change any rates it finds are "unjust, unreasonable, unjustly discriminatory, unduly preferential, or in anywise in violation of law," insufficient, or excessive. See § 364.14(1)(a), Fla. Stat. (1995). Finally, sections 364.17 and 364.18, Florida Statutes (1995), deal with the accounts and records of telecommunication companies.
Thus, section 364.051 grants the Commission the authority to keep records of which companies have elected price regulation, see id. § 364.051(1)(a), and to consider rate increase requests where a price-regulated company makes a "compelling showing of changed circumstances." See id. § 364.051(5). The section also grants the Commission "continuing regulatory oversight of nonbasic services for purposes of ensuring resolution of service complaints, preventing cross-subsidization of nonbasic services with revenues from basic services, and ensuring that all providers are treated fairly in the telecommunications market." See § 364.051(6)(b) (emphasis added).
We recognize that by enacting section 364.051, the Legislature intended to reduce *458 the Commission's authority over price-cap regulated companies.[6] Thus, GTC correctly argues that the Legislature limited the Commission's regulatory control over companies electing price-cap regulation. However, we do not agree with GTC that the limitations on the Commission's authority completely strips the Commission of its power to regulate telecommunication companies, including those companies who no longer operate under rate of return regulation. Several statutory provisions, which were not altered by the Legislature during the 1995 amendments, support this conclusion.
For example, section 364.01 still gives the Commission broad regulatory powers with regard to the telecommunications industry. See § 364.01(2), Fla. Stat. (1995) ("It is the legislative intent to give exclusive jurisdiction in all matters set forth in this chapter to the Florida Public Service Commission in regulating telecommunications companies, and such preemption shall supersede any local or special act or municipal charter where any conflict of authority may exist."). Additionally, section 364.01(4)(a)-(i) defines the Commission's scope of authority, including the power to protect the public health, safety, and welfare, the power to promote competition, and the power to "[e]liminate any rules and/or regulations which will delay or impair the transition to competition." Indeed, the last two jurisdictional provisions (i.e., promoting competition and eliminating anti-competition rules) were added by the 1995 legislature. See ch. 95-403, § 5, Laws of Fla. Importantly, nothing within section 364.051 indicates that price-regulated companies are exempt from the provisions in section 364.01.
Moreover, this case presents a question concerning a subsidy that was established by the Commission and was intended to last only on a temporary basis. In contrast, section 364.051 speaks only to rates for telecommunication services. Neither the statute nor its legislative history addresses subsidies. Thus, we find that while the Legislature intended to limit some of the Commission's authority with regard to companies who no longer operate under rate of return regulation, the Legislature did not vitiate the Commission's authority to eliminate rules it set in place while the telecommunication company operated under rate of return regulation. Indeed, continued adherence to a rule promulgated in accordance with the rate of return regulatory scheme would be inconsistent with section 364.051, which clearly promotes competition and a competitive marketplace.
GTC also contends, however, that even if the Commission has the authority to eliminate the subsidy, it nevertheless applied an incorrect standard in doing so. GTC argues that the statutes regulating local exchange telephone companies now include two fundamentally incompatible regulatory schemes. Under the old rate of return scheme, LECs receiving the interLATA subsidy at issue in this case were subject to periodic earnings review, and the subsidy was gradually reduced or eliminated as over-earnings occurred. Therefore, each decision to reduce or eliminate the subsidy was grounded in the principle of revenue neutrality and in preventing an unconstitutional taking of the LECs' property. In contrast, the 1995 price-cap regulation statutes preclude continued application of an earnings analysis to price-cap regulated *459 companies such as GTC; under this new scheme, there is no basis for eliminating the interLATA subsidy. GTC maintains, therefore, that by incorrectly applying language from the new act (i.e., concluding that GTC's price-cap election constituted a "changed circumstance") to justify the elimination of the revenues derived from the subsidy, the Commission blurred the distinction between the two schemes. We disagree.
An agency's interpretation of the statute it is charged with enforcing is entitled to great deference. See BellSouth Telecommunications, Inc. v. Johnson, 708 So.2d 594, 596 (Fla.1998). As this Court has stated:
The party challenging an order of the Commission bears the burden of overcoming those presumptions by showing a departure from the essential requirements of law. We will approve the Commission's findings and conclusions if they are based on competent substantial evidence and if they are not clearly erroneous.
Ameristeel Corp. v. Clark, 691 So.2d 473, 477 (Fla.1997) (citations omitted). A review of the Commission's prior decisions concerning elimination of the interLATA subsidy for the other recipients of the access subsidy pool reveals that the subsidy was terminated based on those companies' earnings and their need for the subsidy.[7] Thomas F. Lohman, BellSouth's expert, Witness Lohman testified that Gulf was the first company to lose its subsidy because it was over earning and it no longer needed the subsidy. Lohman stated that Indiantown lost its subsidy in 1989 because of its current and anticipated earnings situation. Northeast was next; that company lost its subsidy in 1993 based on its level of earnings and revenues it was receiving from the $.25 calling plan. Finally, the Commission removed Alltel from the subsidy pool in 1995 because it was over-earning. Lohman interpreted this historical account to mean that "the Commission has removed the subsidy when circumstances change and the company no longer needs it."
The Commission's staff witness Mailhot, on the other hand, testified that "[p]rior to the beginning of price cap regulation, the earnings of the subsidy recipient were the only criteria used by the Commission for ending the subsidy." However, he admitted on cross-examination that nothing within the Commission's prior orders stated that earnings were the sole criteria for eliminating the subsidy.
After considering the above testimony, the Commission acknowledged that it previously used over-earnings as the criterion for eliminating the subsidy. See Order PSC-98-1169-FOF-TL at 12. However, the Commission agreed with BellSouth that GTC's election of price-cap regulation "is a substantial change in GTC's circumstances" and that "GTC has demonstrated a desire to take on the opportunities of the competitive arena by electing price regulation." Id. Accordingly, the Commission concluded that GTC's election to operate under price-cap regulation constituted a changed circumstance, *460 warranting the termination of the subsidy. Moreover, the Commission concluded that if GTC believes that the termination of its subsidy amounts to a changed circumstance warranting a rate increase, it may seek relief under section 364.051(5). We find no error with the Commission's conclusion.
While, admittedly, none of the Commission's prior decisions eliminating the inter-LATA subsidy expressly relied on "changed circumstances" as the criterion for eliminating the subsidy, it is apparent from the face of the Commission's prior orders eliminating the subsidy to other LECs that the elimination was based on the fact that the LECs no longer required the subsidy. In other words, the LECs' earnings circumstances had changed to the effect that they no longer relied on the subsidy. Considered in this light, GTC's switch to price-cap regulation is an indication that it no longer needs to be subsidized in order to remain competitive. Further, as the Commission noted, section 364.051(5) offers GTC relief if it finds that its rates are too low. Under that statute, GTC may apply for a rate increase if it demonstrates that its circumstances have now changed due to the termination of the interLATA subsidy. Accordingly, we affirm the Commission's decision to terminate GTC's subsidy or to employ "changed circumstances" as the criterion for eliminating the subsidy.

CROSS-APPEAL
On cross-appeal, BellSouth argues that the Commission erroneously ordered it to reduce its rates in order to avoid a "windfall" based on the terminated subsidy. It maintains that the Commission had no statutory authority to impose such a requirement because, like GTC, BellSouth is now price-cap regulated. Therefore, Bell-South contends that it is exempted from the statutes allowing the Commission to change BellSouth's rates. BellSouth further contends that even if the Commission has the authority to require BellSouth to reduce its rates, its determination was not based on competent, substantial evidence.
As noted above, we will approve the Commission's findings and conclusions only if they are based on competent, substantial evidence and if they are not clearly erroneous. See Ameristeel Corp. v. Clark, 691 So.2d at 477. We need not determine whether the Commission acted within the scope of its authority in reducing Bell-South's rates because we find that the Commission's decision in this regard is not supported by competent, substantial evidence.
According to BellSouth's expert, Thomas F. Lohman, BellSouth initially held a surplus of $2.7 million due to the transition to the bill and keep system. He explained, however, that the surplus eventually dissipated over the years by BellSouth's reduction in access charges and that the surplus has not existed for many years. He further explained that beginning in 1988, access rates were no longer uniform and, in fact, varied from company to company. Since 1987, BellSouth has reduced its access rates by over $200 million and is no longer collecting access revenues for GTC. Rather, BellSouth is simply paying GTC a subsidy. Therefore, Lohman contended that based on the amount of rate reductions BellSouth has made since 1987, Bell-South will not gain a windfall or otherwise benefit from the termination of the subsidy to GTC.
AT & T's witness, Mike Guedel, on the other hand, testified that BellSouth's past reductions were the result of earnings reviews. He claimed that "[b]ecause the subsidy payments were part of BellSouth's intrastate operations at the time of these *461 reviews, presumably these subsidy payments were included in the determination of intrastate earnings. In other words, previous rate reductions reflected excess earnings determined after the recognition of the subsidy payments." Guedel concluded that despite BellSouth's prior reductions, BellSouth would still enjoy a financial windfall if it is not required to reduce "other rates." Guedel pointed out that the pool was funded by the revenue received from the access charges to the interexchange companies. Dale Mailhot, the Commission's staff witness, agreed with Guedel's conclusion. However, neither witness offered documentation or other proof that BellSouth would enjoy a windfall.
The record clearly reflects that neither GTC, the Commission's staff, nor AT & T provided documentary evidence at the hearing that BellSouth collects access charges for GTC. Nevertheless, the Commission agreed with GTC, AT & T, and its staff that BellSouth would enjoy a windfall if its rates were not reduced. The Commission acknowledged BellSouth's past rate reductions and the disposition of its $2.7 million surplus. However, it noted that the "evidence indicates that the IXCs funded the subsidy pool by their use of the local network, even though BellSouth's access charges were reduced." Accordingly, the Commission concluded that in eliminating GTC's subsidy, "it is also appropriate to require BellSouth to make adjustments in order to eliminate all aspects, including any windfall, associated with this subsidy, which was implemented when BellSouth and GTC were both under a different regulatory scheme." Order No. PSC-98-1169-FOF-TL at 16. Because of the fact that BellSouth has significantly reduced its access charges in the past, the Commission ruled that BellSouth could select a different rate to reduce. The record simply does not support the Commission's conclusion.
As pointed out by BellSouth, although AT & T's witness testified that BellSouth would enjoy a windfall if its rates were not reduced, AT & T did not produce any documents or factual support for this conclusion. Indeed, the only evidence of a "windfall" appears to be the conclusory statements by two witnesses (i.e., Guedel and Mailhot). There was no testimony as to what rates or charges BellSouth uses to fund the subsidy payments. In fact, in response to a question from one of the commissioners, Lohman testified that it is impossible to track the source of the subsidy payments as coming solely from access charges. He claimed that the subsidy payment comes from all services provided. He further noted that the Commission ceased requiring uniform access rates and that the access rates varied from company to company. Finally, Lohman testified that BellSouth no longer collects access charges for GTC. Based on the lack of evidence that BellSouth would realize a financial windfall from the elimination of the subsidy payment to GTC and based on the unrefuted testimony by BellSouth that it no longer collects rates for GTC, we find that the Commission's decision requiring BellSouth to reduce its rates was clearly erroneous. See Ameristeel Corp., 691 So.2d at 477. Accordingly, we hold that the Commission erred in ordering Bell-South to reduce its rates in order to avoid a windfall.

CONCLUSION
In sum, we affirm the portion of Order No. PSC-98-1169-FOF-TL concerning the Commission's decision to terminate the interLATA subsidy to GTC. However, we *462 reverse the portion of the order requiring BellSouth to reduce its rates in conjunction with the elimination of the subsidies to GTC on the ground that the decision was not supported by competent, substantial evidence.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS, C.J., recused.
NOTES
[1] There are several LATAs within Florida and these geographical areas define the territory within which the local exchange carriers (LEC) are authorized to operate. See Miles W. Hughes, Comment, Telecommunications Reform and the Death of the Local Exchange Monopoly, 24 Fla. St. U.L.R. 179, 186 (1996).
[2] At the time Order No. 14452 was issued, the Commission acknowledged that full implementation of the bill and keep system would leave several LECs with an insufficient rate of return, despite additional revenues from newly enacted $.25 calling charge and directory assistance charges. The Commission concluded that

[e]ven after adjusting for these additional revenues, seven LECs will still experience a shortfall. Since our stated intent is to have a "wash" when implementing bill and keep, we find that a temporary subsidy pool is required and is in the public interest. The pool will be funded by each LEC contributing a portion of the access revenues it receives for use of its local network.
Order No. 14452 at 12.
[3] The companies included: Centel, Florala, GTE, Quincy, Southern Bell (n/k/a BellSouth), Southland, and Vista-United. Florala, Quincy, Southland, and Vista-United were removed from the pool in 1989. Centel was removed from the pool in 1990 and GTE was removed from the pool in 1993. Only Bell-South remains a member of the pool.
[4] The receiving LECs included: Alltel, Gulf, Indiantown, Northeast, St. Joseph Telephone and Telegraph Company (n/k/a GTC), and United. Gulf, Indiantown and United were removed from the pool in 1989. In 1993, Northeast was removed from the subsidy pool. In 1995, Alltel was removed from the pool.
[5] That section provides in pertinent part:

Notwithstanding the provisions of subsection (2), any local exchange telecommunications company that believes circumstances have changed substantially to justify any increase in the rates for basic local telecommunications services may petition the commission for a rate increase, but the commission shall grant such petition only after an opportunity for a hearing and a compelling showing of changed circumstances.
§ 364.051(5), Fla. Stat. (1995). The 1997 version of this section is the same.
[6] According to the legislative history to the 1995 changes in the law, the price regulation scheme "permits the prices and rates for services to be regulated by market forces rather than the PSC." Fla. H.R. Comm. on Util. & Telecom., CS for SB 1554 (1995) Staff Analysis 1 (final May 18, 1995) (on file with comm.).
[7] For example, in its 1995 order concerning Alltel, the Commission summarized its action:

The subsidy receipts and payments do not change each year except by specific action of the Commission. We have reduced subsidies and removed LECs from the inter-LATA subsidy pool when it appeared that the LEC no longer needed the subsidy. Each such action has always been in a case by case basis and has occurred when a LEC's earnings would support a reduction of the subsidy.
In re Investigation into interLATA bill and keep subsidy of Alltel Florida, Inc., Docket No. 950261-TL, Order No. PSC-95-0486-FOF-TL, at 2 (F.P.S.C. Apr. 13, 1995).