967 So.2d 781 (2007)
GTC, INC., etc., Appellant,
v.
Lisa Polak EDGAR, etc., et al., Appellees.
No. SC06-1786.
Supreme Court of Florida.
September 6, 2007.
*783 Kenneth A. Hoffman and Marsha E. Rule of Rutledge, Ecenia, Purnell and Hoffman, P.A., Tallahassee, FL, for Appellants.
David E. Smith, Attorney Supervisor, Florida Public Service Commission, Tallahassee, Florida, and Harold McLean, Public Counsel and Charles J. Beck, Deputy Public Counsel, Office of Public Counsel c/o The Florida Legislature, Tallahassee, FL, for Appellees.
PARIENTE, J.
This case is before the Court on appeal from an order of the Florida Public Service Commission (PSC). The PSC order relates to a petition by GTC, Inc., d/b/a GT Com (GTC) to impose a customer surcharge pursuant to section 364.051(4)(b), Florida Statutes (2005), for costs incurred following Hurricane Dennis in 2005. We have mandatory jurisdiction because the order relates to the rates of a public utility providing telephone service. See art. V, § 3(b)(2), Fla. Const.; § 364.381, Fla. Stat. (2005).

BACKGROUND
GTC is a local telecommunications company that served approximately 46,861 lines in seventeen exchanges in the Florida Panhandle/Big Bend area in 2005. Before 1995, incumbent local exchange telephone companies (ILECs), such as GTC, were monopolies subject to extensive rate base, rate of return regulation. In 1995, section 364.051(1), Florida Statutes, was enacted to provide that ILECs electing price-cap regulation would be exempt from rate base, rate of return regulation and from the requirements of several statutes under which the PSC formerly regulated the company's rates. See ch. 95-403, § 9, Laws of Fla.[1] Instead, an ILEC's rates would be frozen at 1995 levels with three means for a rate increase: allowance of an *784 inflationary factor beginning in 2000; a general increase where there is a compelling showing of changed circumstances; and certain allowable increases for nonbasic rates. See § 364.051(2)-(5), Fla. Stat. (1995). GTC elected price-cap regulation under section 364.051 in 1996. See GTC, Inc. v. Garcia, 791 So.2d 452, 455 (Fla. 2000).
Shortly before Hurricane Dennis hit Florida in 2005, section 364.051 was amended by the addition of subsection (4)(b). This subsection, effective June 2, 2005, provides that damage resulting from a named tropical system occurring after June 1, 2005, constitutes a "compelling showing of changed circumstances" for which a temporary line-item surcharge may be granted for recovery of those intrastate costs of replacements and repairs caused by the storm. See ch. 2005-132, § 28, at 1230, Laws of Fla. Under the 2005 amendment creating section 364.051(4)(b), an ILEC, such as GTC, may file a petition with the PSC for a line-item surcharge to be included in its billings to recover intrastate costs and expenses related to repairing, restoring, or replacing lines, plants, or facilities damaged by a named tropical system such as Hurricane Dennis.
GTC was the first ILEC to file a petition under the new storm cost recovery procedures, seeking recovery of costs associated with the repair and replacement of its lines, plants, and facilities damaged by Hurricane Dennis. Included in the hurricane costs sought by GTC were capital costs, in-house labor and engineering costs, and normal operating costs and overhead allocated to storm repair. In total, GTC submitted intrastate costs of $312,693 for expenses it attributed to hurricane-related work.
GTC sought PSC approval to add the statutory maximum of $.50 per customer line to billings for one year.[2] GTC took the position that the "costs and expenses" referred to in the statute were all costs and expenses related to the storm replacements and repairs without limitation. Public Counsel for the Citizens of the State of Florida ("Public Counsel"), intervenor below and an appellee here, took the position that section 364.051(4)(b) confers both broad discretion and a duty on the PSC to determine which costs are reasonable for approval as a storm surcharge.
After an evidentiary hearing, the PSC rejected GTC's position that it lacked discretion under the statute to prevent a double recovery or to examine whether costs were incurred within or in excess of normal operating costs. The PSC ultimately ruled that GTC could impose only a one-time $.11 line-item surcharge to recover a total of $4,950 in adjusted storm repair costs. GTC now challenges the PSC's denial of $43,068 for in-house labor and engineering costs, $141,552 in capital costs, and its decision to set off $40,209 against storm costs, which represents federal support reimbursement funds projected to be received by GTC because of GTC's storm costs and expenses.[3]
*785 On appeal to this Court, GTC asserts that the PSC misconstrued its statutory responsibilities by not allowing GTC to impose the maximum surcharge based on all of the costs incurred to repair its lines and restore service following the hurricane. GTC asserts that by virtue of its status as an ILEC, whose rates are price-capped and not subject to rate base, rate of return regulation, the PSC had no authority to determine whether the costs incurred were in excess of its normal operating costs. Further, GTC asserts that double or even triple recovery should be irrelevant to the PSC inquiry.

ANALYSIS
The issues in this appeal are whether the PSC acted in accord with the legislative mandate of section 364.051(4)(b) and whether there is competent, substantial evidence in the record to support the PSC's findings and conclusions. The specific statutory construction question that we must resolve in this case is whether the PSC correctly interpreted section 364.051(4)(b) as providing the PSC with discretion to deny storm surcharge recovery for costs and expenses that the PSC finds are not in excess of normal operating costs or normal capital costs, or that are expected to be reimbursed by a federal subsidy.

Standard of Review
Generally speaking, statutory interpretation is a question of law subject to de novo review. See BellSouth Telecomm., Inc. v. Meeks, 863 So.2d 287, 289 (Fla.2003). The plain meaning of the statute is always the starting point in statutory interpretation. See Holly v. Auld, 450 So.2d 217, 219 (Fla.1984). As explained in Holly and recited many times by the Court:
Florida case law contains a plethora of rules and extrinsic aids to guide courts in their efforts to discern legislative intent from ambiguously worded statutes. However,
[w]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.
Id. (quoting A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931)). Thus, if the meaning of the statute is clear then this Court's task goes no further than applying the plain language of the statute. However, when a statutory term is subject to varying interpretations and that statute has been interpreted by the executive agency charged with enforcing the statute, this Court follows a deferential principle of statutory construction:
An agency's interpretation of the statute that it is charged with enforcing is entitled to great deference. See BellSouth Telecommunications, Inc. v. Johnson, 708 So.2d 594, 596 (Fla.1998). This Court will not depart from the contemporaneous construction of a statute by a state agency charged with its enforcement unless the construction is "clearly unauthorized or erroneous."
Level 3 Commc'ns, LLC v. Jacobs, 841 So.2d 447, 450 (Fla.2003) (quoting P.W. Ventures, Inc. v. Nichols, 533 So.2d 281, 283 (Fla.1988)).

Statutory Construction of Section 364.051(4)(b)
The agency's construction of section 364.051(4), as amended in 2005, was a matter of first impression for the PSC. Prior to the 2005 amendment, one of the grounds provided by section 364.051(4) for allowing a price-capped local telecommunications *786 company to request a rate increase was by "a compelling showing of changed circumstances." § 364.051(4), Fla. Stat. (2004). The 2005 amendment added subsection (4)(b) specifically for tropical storm damage, and expressly provided that damage resulting from a named tropical system would constitute a compelling showing of changed circumstances sufficient for a company to petition for a temporary rate increase. As enacted, section 364.051(4)(b), provides in pertinent part:
(b) For purposes of this section, evidence of damage occurring to the lines, plants, or facilities of a local exchange telecommunications company that is subject to the carrier-of-last-resort obligations, which damage is the result of a tropical system occurring after June 1, 2005, and named by the National Hurricane Center, constitutes a compelling showing of changed circumstances.
1. A company may file a petition to recover its intrastate costs and expenses relating to repairing, restoring, or replacing the lines, plants, or facilities damaged by a named tropical system.

2. The commission shall verify the intrastate costs and expenses submitted by the company in support of its petition.

3. The company must show and the commission shall determine whether the intrastate costs and expenses are reasonable under the circumstances for the named tropical system.

4. A company having a storm-reserve fund may recover tropical-system-related costs and expenses from its customers only in excess of any amount available in the storm-reserve fund.
5. The commission may determine the amount of any increase that the company may charge its customers, but the charge per line item may not exceed 50 cents per month per customer line for a period of not more than 12 months.
(Emphasis supplied.) Therefore, under section 364.051(4)(b)(2), the PSC must verify the storm-related intrastate costs and expenses. Further, the company must show and the PSC must determine that the "costs and expenses are reasonable under the circumstances for the named tropical system." § 364.051(4)(b)(3), Fla. Stat.
Public Counsel and the PSC both rely on the portion of the statute that provides that "[t]he company must show and the [PSC] shall determine whether the intrastate costs and expenses are reasonable under the circumstances for the named tropical system." § 364.051(4)(b)(3), Fla. Stat. The PSC views the plain meaning of section 364.051(4)(b)(3) as authority to exercise broad discretion to allow surcharge recovery of only those costs that it finds are reasonable in relation to the storm, meaningin the PSC's viewonly those costs and expenses that are in excess of normal operating costs and normal capital costs, and which are not recovered through some other means. The PSC contends that any other statutory interpretation would be unreasonable because it would allow customers to be billed twice for the same costs. Additionally, the PSC and Public Counsel assert that because the PSC is charged with enforcing this statute, its interpretation as to the meaning of reasonableness for purposes of recovery of hurricane costs is entitled to deference and is not clearly unauthorized or erroneous.
GTC, on the other hand, argues that the phrase "reasonable under the circumstances for the named tropical system" in section 364.051(4)(b)(3) is not authorization for the PSC to engage in a general reasonableness inquiry, but limits its determination of reasonableness only to determining that the costs were expended in repairing damage caused by the named tropical system. GTC further contends that the plain *787 meaning of section 364.051(4)(b)(1), as evidenced by its text, allows surcharge recovery of all "intrastate costs and expenses relating to repairing, restoring, or replacing the lines, plants, or facilities damaged by a named tropical system." GTC submits that the only limitations which may be imposed are those stated in subsections (4) through (8), none of which expressly disallow recovery of costs on the basis that they involve in-house labor and engineering, prudent replacement practices, normal capital costs, or offsets for federal subsidy funds.
Because the phrase "reasonable under the circumstances for the named tropical system" is subject to differing interpretations, we conclude that the statute is ambiguous as to the scope of the PSC's authority to disallow expenses and thus statutory interpretation is appropriate. The PSC interprets the statutory provision "reasonable under the circumstances for the named tropical system" as imposing on it an obligation to scrutinize costs for reasonableness and in a manner that will avoid double recovery, thereby allowing recovery only for costs that exceed normal operating costs and normal capital costs. This interpretation is a reasonable view of the statute and the PSC's role in administering it. We reject GTC's contention that this interpretation is "clearly unauthorized or erroneous." Level 3 Commc'ns, 841 So.2d at 450. As explained by the PSC in its order:
We find the phrase "reasonable under the circumstances" allows us great latitude in determining the methodology and factors that should be taken into consideration when reviewing the petitioner's request. We also find that this statute was enacted to assist the petitioner in defraying additional costs caused by extraordinary circumstances, specifically tropical storms.
One of the main goals of this statute is to assist the petitioner financially. Accordingly, the reasonable clause implicitly ensures that storm related cost recovery should be based on expenditures incurred over and above normal operating expenditures. It is highly unlikely that the Legislature intended, through Section 364.051(4), Florida Statutes, to reimburse companies for costs that they would have incurred regardless of whether a storm had occurred or not.
Because this is a reasonable construction, we apply the rule of statutory interpretation that requires us to defer to the PSC's expertise and its interpretation of the provision.
We do not, however, rely only on the principle of deference. We must also consider the principle of construction that parts of a statute are not read in isolation. "It is axiomatic that all parts of a statute must be read together in order to achieve a consistent whole." Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992). The PSC's interpretation of the scope of its discretion is supported by another provision contained in section 364.051(4)(b). Section 364.051(4)(b)(5) provides that "[t]he commission may determine the amount of any increase that the company may charge its customers, but the charge per line item may not exceed 50 cents per month per customer line for a period of not more than 12 months." (Emphasis supplied.) The discretionary nature of the phrase, "may determine the amount of any increase," supplies additional support for the interpretation reached by the PSCthat the PSC is invested with discretion to determine what amount of storm recovery costs are reasonable to be charged to the consumer.
Support for the PSC's interpretation is also found in a related statutory provision contained in chapter 364. Section 364.01(4)(a), Florida Statutes (2005), requires *788 the PSC to "[p]rotect the public health, safety, and welfare by ensuring that basic local telecommunications services are available to all consumers in the state at reasonable and affordable prices." That provision directs the PSC to exercise its jurisdiction in order to protect consumers, in part, by ensuring the availability of telecommunications services at reasonable prices. This Court has previously recognized that the PSC's authority vis-a-vis ILECs derives in part from the legislative mandate contained in section 364.01(4)(a). See Crist v. Jaber, 908 So.2d 426, 430 (Fla.2005); GTC, 791 So.2d at 457-58. GTC's reading of section 364.051(4)(b), in a manner that would divest the PSC of any discretion to determine the reasonableness of costs sought, is contrary to the PSC's authority to ensure the availability of reasonably priced telecommunications services.
GTC has also characterized the PSC's determination of what costs are reasonable for recovery under section 364.051(4)(b) as an improper rate base, rate of return analysis that is inapplicable to GTC, a price-capped entity. However, that argument was rejected in GTC when GTC previously challenged the extent of the PSC's authority in matters involving price-capped companies. As we explained in GTC, other provisions in chapter 364 support the conclusion that the Legislature intended for the PSC to retain certain powers with respect to ILECs:

For example, section 364.01 still gives the Commission broad regulatory powers with regard to the telecommunications industry. See § 364.01(2), Fla. Stat. (1995) ("It is the legislative intent to give exclusive jurisdiction in all matters set forth in this chapter to the Florida Public Service Commission in regulating telecommunications companies, and such preemption shall supersede any local or special act or municipal charter where any conflict of authority may exist."). Additionally, section 364.01(4)(a)-(i) defines the Commission's scope of authority, including the power to protect the public health, safety, and welfare, the power to promote competition, and the power to "[e]liminate any rules and/or regulations which will delay or impair the transition to competition." Indeed, the last two jurisdictional provisions (i.e., promoting competition and eliminating anti-competition rules) were added by the 1995 legislature. See ch. 95-403, § 5, Laws of Fla. Importantly, nothing within section 364.051 indicates that price-regulated companies are exempt from the provisions in section 364.01.

Id. at 458 (emphasis supplied).
In this case, reading section 364.01(4)(a) (the PSC shall exercise its jurisdiction to ensure telecommunications services are available at reasonable prices) together with section 364.051(4)(b)(3) (the PSC shall determine whether the costs are reasonable under the circumstances of the storm) and section 364.051(4)(b)(5) (the PSC may determine the amount of any increase), further supports the PSC's construction of the statute as providing it with discretion to determine what storm costs may reasonably be passed on to the consumer.
The PSC also noted in its order that the Senate Staff Analysis and Economic Impact Statement for the 2005 amendment was in accord with its own interpretation of legislative intent for that provision. The Senate staff analysis for section 364.051(4)(b) stated:
The committee substitute requires that the company show, and the commission determine, whether costs and expenses are reasonable under the circumstances. Traditionally, for rate-base-regulated industries, the commission would apply a "prudent and reasonable" test to ensure, for example, that costs *789 are not double recovered, are booked to the appropriate costs accounts, and are necessary for the restoration process. The proposed language implies a similar type of review.
Fla. Senate Commerce & Consumer Services Comm., CS for CS for SB 2232 § 19, Staff Analysis 2 (April 12, 2005). Certainly, while not determinative of final legislative intent, it is "one touchstone of the collective legislative will," White v. State, 714 So.2d 440, 443 n. 5 (Fla.1998), on which the PSC relied for confirmation of its own interpretation of the statute. In this case, given an ambiguous statute and our utilization of several principles of statutory construction, the staff analysis serves merely as confirmation of the reasonable interpretation employed by the PSC.[4]
GTC contends that the PSC erroneously relied on the staff analysis and then points to section 366.8260(1)(n), Florida Statutes (2005), as support for its argument that the Legislature did not intend for the PSC to apply a reasonableness test under section 364.051(4)(b). Section 366.8260(1)(n) is a storm-recovery cost provision that pertains to investor-owned electric utilities and was enacted during the same 2005 legislative session as was section 364.051(4)(b). See ch. 2005-107, § 1, at 1029, Laws of Fla. Section 366.8260(1)(n) is found within an extensive and detailed regulatory framework and provides for adjustment of storm-recovery costs for rate base, rate of return regulated electric utilities, as follows:
(n) "Storm-recovery costs" means, at the option and request of the electric utility, and as approved by the commission . . . costs incurred or to be incurred by an electric utility in undertaking a storm-recovery activity. Such costs shall be net of applicable insurance proceeds and, where determined appropriate by the commission, shall include adjustments for normal capital replacement and operating costs, lost revenues or other potential offsetting adjustments.

(Emphasis supplied.) This provision evidences legislative intent to limit the storm-recovery costs under section 366.8260 for rate base, rate of return regulated electric utilities to those costs and expenses that exceed normal overhead or normal capital replacement.
In comparison, the 2005 provision for storm cost recovery procedures for ILECs found in section 364.051(4)(b) contains no similar roadmap for calculating the storm recovery costs for price-capped ILECs such as GTC. GTC argues that because the Legislature included no similar limitations in section 364.051, it intended no limitations on the storm costs that can be recovered under that section, other than the expressly stated limitation concerning a storm-reserve fund, which is not applicable here. The PSC contends, on the other hand, that section 364.051(4)(b) provides the PSC greater discretion in the determination of reasonableness of storm cost recovery than does section 366.8260 because it does not limit the exercise of discretion to enumerated factors. We agree with the PSC that the storm cost recovery provisions contained in section 364.051(4)(b) for price-capped companies do not eliminate the ability of the PSC to exercise discretion to determine the reasonableness of claimed costs under the circumstances for the tropical system.
The PSC's construction of the storm cost recovery provisions of section 364.051(4)(b) that prevents consumers from paying twiceonce for all those costs *790 and expenses normally covered by their regular rates and once again for the same costs and expenses in a line-item storm recovery surchargefalls within the overall goal of section 364.01(4)(a). Further, the PSC's construction is founded on the text of section 364.051(4)(b), and is a reasonable interpretation of a statute that is within the PSC's broad regulatory authority. GTC has not carried its burden of showing that the PSC's construction of section 364.051(4)(b) is clearly unauthorized or erroneous.

Disallowance of Specific Expenses
We next address GTC's arguments relating to the PSC's denial of storm surcharge recovery for certain specified costs and expenses: (A) In-House Plant and Engineering Labor Expenses; (B) Capital Costs; and (C) Universal Service Fund Set-off. In so doing, we remain mindful of our standard of review:
[T]he Commission's factual findings are entitled to a presumption of correctness.
To overcome these presumptions, a party challenging an order of the Commission on appeal has the burden of showing a departure from the essential requirements of law and the legislation controlling the issue, or that the findings of the Commission are not supported by competent, substantial evidence. "This Court will approve the commission's findings and conclusions if they are based upon competent, substantial evidence and are not clearly erroneous."
Crist, 908 So.2d at 430 (citations omitted) (quoting W. Fla. Elec. Coop. Ass'n v. Jacobs, 887 So.2d 1200, 1204 (Fla.2004)). In Verizon Florida, Inc. v. Jaber, 889 So.2d 712, 714 (Fla.2004), this Court stated:
"[O]rders of the Commission come before this Court clothed with the statutory presumption that they have been made within the Commission's jurisdiction and powers, and that they are reasonable and just and such as ought to have been made." GTC, Inc. v. Garcia, 791 So.2d 452, 456 (Fla.2000) (quoting United Tel. Co. v. Public Serv. Comm'n, 496 So.2d 116, 118 (Fla.1986)). ". . . We will approve the Commission's findings and conclusions if they are based on competent substantial evidence, and if they are not clearly erroneous." Gulf Coast Elec. Co-op., Inc. v. Johnson, 727 So.2d 259, 262 (Fla.1999).
See also Fla. Interexchange Carriers Ass'n v. Clark, 678 So.2d 1267, 1270 (Fla.1996). "While there may be legitimate disagreements as to the weight and credibility of the evidence presented below, this Court's review is limited to a determination of whether evidence exists to support the Commission's findings." Crist, 908 So.2d at 432. We will not reweigh the evidence or overturn an order of the PSC because the Court might have arrived at a different result. Gulf Power Co. v. Fla. Pub. Serv. Comm'n, 453 So.2d 799, 803 (Fla.1984). Therefore, we will approve the specific cost disallowances and set-off by the PSC if they are based upon competent, substantial evidence and are not clearly erroneous.

(A) In-House Plant and Engineering Labor Expenses
GTC challenges the PSC's disallowance of recovery for storm-related in-house plant and engineering and labor expenses in the amount of $43,068. The testimony of GTC's regional controller, R. Mark Ellmer, established that GTC's petition included costs for normal material and labor, costs of construction, wages and benefits, budgeted overtime labor, regular time labor, and overhead. Public Counsel's expert testified that because GTC submitted invoices of total costs, and not extraordinary costs over and above normal operating costs and normal capital costs, there was no way to verify the extraordinary costs that might be considered recoverable *791 under the PSC's interpretation of the statute.
The PSC disallowed these in-house labor and engineering expenses because it found that they were included within normal business operations and would have been incurred without the storm. The PSC concluded in its order that
GT Com's in-house labor costs should not be included in the amount to be recovered through a storm charge as the Company is already recovering this amount through its normal business operations. Witness Ellmer agreed during cross examination that its in-house labor costs that were included in GT Com's storm cost recovery request amount, would have been incurred by the Company regardless of whether Hurricane Dennis had occurred. The cost included for in-house labor, therefore, was not incurred as an extraordinary amount related to Hurricane Dennis. Since the labor costs would have been incurred by GT Com regardless of whether Hurricane Dennis had occurred, it is not reasonable for the Company to recover these costs through the storm charge recovery mechanism.
It should be noted that, although the PSC denied recovery of costs it found were included in normal business operations, it did allow recovery of expenses for contracted labor.
GTC contends that the PSC should not be concerned with whether the costs sought are already covered by normal operating costs and expenses. GTC asserts that the possibility of double recovery is irrelevant under the statute because its rates are not based on rate base, rate of return regulation. We have already rejected this argument in construing the statute. Moreover, GTC presented no evidence that as a result of using in-house labor to make the extensive repairs, it suffered any additional costs or incurred overtime expenses over and above its normal costs. Therefore, in this case GTC failed to carry its statutory burden of establishing that the in-house labor and engineering "costs and expenses are reasonable under the circumstances for the named tropical system." § 364.051(4)(b)(3), Fla. Stat.
Other than advancing its interpretation of the statute as a basis for reversal, GTC has not overcome the presumption of correctness accorded to the PSC order or demonstrated how the PSC erred in disallowing in-house plant and engineering labor expenses that GTC did not show were over and above its normal expenses. The PSC's decision was based upon application of its construction of the statute to its factual findings, and those findings are supported by competent, substantial evidence.

(B) Capital Costs
GTC also sought recovery of intrastate capital costs in the amount of $141,552, contending that the words used in the statute and the fact that GTC is a price-capped entity demonstrate legislative intent to allow full recovery of all actual capital costs of replacing any lines, plants, or facilities damaged by the storm. Mr. Ellmer confirmed that the petition for recovery of storm costs included claims for capitalized material, capitalized building repairs, capital asset costs, and equipment. These capital costs included capital assets that were replaced or added during repairs necessitated by storm damage. Included within the capital equipment costs was $80,405 for a new Alligator Point CXR System, which is a carrier system to provide new voice and data service over fiber optic lines at Alligator Point. The PSC found it unreasonable for GTC to recover from consumers, in one year, the full cost of capital assets that it would normally depreciate over fifteen years, and that replace *792 assets that have been, for the most part, fully depreciated. Specifically, the PSC reasoned:
We question whether it is reasonable to allow the entire capital asset cost to be recovered over a one-year period. GT Com has acknowledged that the economic lives of these assets are greater than one year as it has established a 15-year depreciable life for the capitalized assets addressed in this case. With the exception of 726 feet of cable, all assets that were replaced by GT Com as a result of Hurricane Dennis, were fully depreciated. Allowing recovery of the replacement plant in a one-year period, when GT Com's current depreciation policy is to use a fifteen year life, is not reasonable. Businesses operating in a competitive environment do not recoup capital asset costs in a single yearthe costs are included in the balance sheet with the goal of earning a return on the assets over time.
Section 364.051(4)(b)(1), Florida Statutes, allows a company to file a petition to recover its intrastate costs and expenses relating to repairing, restoring, or replacing the lines, plants, or facilities damaged by a named tropical system. The statute, however, does not provide a definition of the term "costs." Costs can logically mean the dollars expended to repair, restore, or replace; or, costs can be defined as the incremental increase in total costs. Many other definitions exist for the term "costs."
We have consistently applied the principle that when an asset exceeds a minimum threshold level and has a long term life, that asset should be capitalized. With respect to petitions for storm cost recovery, we have consistently applied this capitalization methodology.[5] Capitalization of assets is not limited to regulated utilitiesit is used by most businesses.
The PSC's treatment of capital costs is based on its interpretation of the reasonableness requirement of section 364.051(4)(b). Although section 364.051(4)(b) neither provides a definition of storm costs nor expressly discusses adjustments for normal capital costs, as does section 366.8260(1)(n) for electric utilities, section 364.051(4)(b) does expressly require that the company show and the PSC find that the costs to be recovered for replacing lines, plants, or facilities are reasonable under the circumstances of the storm. The PSC's determination in regard to capital costs, based on its construction of this statute, is not clearly erroneous and will not be disturbed. While we are not prepared to state that in all circumstances recovery of 100% of capital expenditures made in one year because of a storm should be disallowed, in this case GTC has not carried its burden of demonstrating error in the PSC's order disallowing recovery of its capital costs related to Hurricane Dennis.

(C) Universal Service Fund Set-off
The last area of contention is the PSC's set-off of $40,209 in projected Universal Service Fund reimbursement payments against GTC's 2005 storm costs. As a rural company, GTC is eligible to receive a "High-Cost Loop Support" payment *793 from the Federal Universal Service Fund (USF), in differing percentages to the extent that its overall cost per loop (line from company to end user customer location) exceeds 115% to 150%, or exceeds 150%, of the national average cost per loop. These payments are administered by the Universal Service Administration Company and approved by the Federal Communications Commission. The support payment is calculated on an after-the-fact basis and is paid over time beginning in 2007 for the year 2005. The evidence established that GTC has received USF subsidy payments since 1986 and would receive a USF subsidy payment for the year 2005 in an additional amount based on increased costs due to storm repairs. Based on this history, the PSC in this case applied a portion of those projected support payments as an offset against GTC's intrastate storm recovery costs.
The PSC interpreted that part of section 364.051(4)(b)(1), Florida Statutes (2005), which provides that a company "may file a petition to recover its intrastate costs and expenses," as providing it with discretion to disallow recovery of any cost that has been or will be recouped through other means. GTC argues, however, that the amount of future USF support payments, to be commenced in 2007 for the year 2005, is too speculative to serve as the basis for offsetting any hurricane costs. Mr. Ellmer testified that assuming there is no change in the national average cost per loop, GTC is expected to receive $141,449 in additional USF support payments on account of its 2005 hurricane costs. He qualified that testimony by stating that based on possible changes in cost per loop GTC might only receive $121,317. Mr. Ellmer further testified that GTC had received USF reimbursements since at least 1986. Public Counsel's expert witness testified that because of the increased cost resulting from items being capitalized and items being expensed as a result of the storm, GTC will receive additional high-cost loop support payments, which should be taken into consideration in approval of storm recovery costs.
The PSC found that because GTC's average loop costs have exceeded the national average in excess of 150% for the past five years and GTC has received reimbursements since at least 1986, GTC should once again qualify for the maximum level of funding. The PSC further determined that, because the Universal Service Fund is funded through consumer payments in the first instance, increased support payments attributable to 2005 hurricane costs should be offset against those costs and not paid for a second time by the consumer through storm cost surcharge.
The PSC did not, however, reduce GTC's claim by the full $141,449 projected reimbursement. Instead, the PSC concluded that because there was a downward adjustment in GTC's allowable storm cost expense, there should be a corresponding downward adjustment in the amount of the USF reimbursement to be applied as an offset. In accord with the adjustments made to GTC's total claim, the PSC adjusted the total support payment, for purposes of offsetting storm costs, to $40,209. The record further established that GTC will begin receiving USF funds based on its 2005 costs, including storm costs, in January 2007. The PSC took the two-year delay in receipt of the USF payments into account and approved recovery by GTC of carrying costs of $3,886, which were calculated at the commercial paper rate. It is not clearly erroneous for the PSC to consider and give weight to evidence of a long record of increasing subsidy payments and documentary evidence showing projected support payments. Moreover, we agree that in considering recoverable costs, it is not clearly erroneous for the PSC to disallow double recovery.
*794 Because the PSC had before it competent, substantial evidence to support its determination that GTC will receive additional USF funds on account of costs related to Hurricane Dennis, the PSC's permissible construction of the statute and decision to set off USF funds in the amount of $40,209 against storm costs will not be disturbed.

CONCLUSION
For the reasons explained above, we conclude that GTC has not carried its burden of showing that the PSC's construction of section 364.051(4)(b) is clearly unauthorized or erroneous or that the determinations by the PSC are not based upon competent, substantial evidence. The PSC is required by sections 364.051(4)(b) and 364.01(1)(4)(a) to consider the reasonableness of the cost of services to the consumers when making decisions that relate to rates or services, as it has done in the order under review. The PSC's decision to disallow storm cost surcharge recovery for plant and engineering labor costs of $43,068 and capital costs of $141,552, and the decision to offset $40,209 in projected USF support payments against storm costs, is based upon competent, substantial evidence and on a reasonable construction of section 364.051(4)(b). Therefore, those decisions will not be disturbed.
Accordingly, Order No. PSC-06-0681-FOF-TL of the Public Service Commission is affirmed.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Section 364.051(1)(c), Florida Statutes (2005), expressly exempts price-cap companies from "rate base, rate of return regulation and the requirements of ss. 364.03, 364.035, 364.037, 364.05, 364.055, 364.14, 364.17 and 364.18." The "`rate base' is the amount of investment on which a regulated public utility is entitled to an opportunity to earn a fair and reasonable return; it represents the total investment in, or the fair value of, the used and useful property that it necessarily devotes to rendering the regulated services." 64 Am. Jur.2d Public Utilities § 98 (2001). In rate base, rate of return regulation, the rate of return is to be set at a level that provides an "opportunity to earn a fair or reasonable rate of return on its invested capital." United Tel. Co. of Fla. v. Mann, 403 So.2d 962, 966 (Fla.1981).
[2] Because the statute allows a maximum of $.50 per customer line per month for one year, the maximum GTC could recover based on 46,861 lines would be $281,166.
[3] GTC does not challenge on appeal the PSC's denial of recovery for $28,158 in intrastate costs for upgrading damaged copper cable to fiber optic lines in the Alligator Point area which, while prudent, was not necessitated by the hurricane. Further, GTC does not challenge on appeal the PSC's denial of recovery for allocated employee benefits of $38,952 and normal overhead of $19,767 allocated to storm repair activities.
[4] This Court is not unified in its view of the use of legislative staff analyses to determine legislative intent. See Am. Home Assurance Co. v. Plaza Materials Corp., 908 So.2d 360, 375-76 (Fla.2005) (Cantero, J., concurring in part and dissenting in part).
[5] The PSC refers to orders which have applied this capitalization approach: In re Petition by Fla. Power & Light Co., Order No. PSC-05-0937-FOF-EI (Fla.Pub.Serv.Comm. Sept. 21, 2005); In re Petition by Progress Energy Fla., Inc., Order No. PSC-05-0748-FOF-EI (Fla.Pub.Serv.Comm. July 14, 2005); In re Petition by Sprint-Fla., Inc., Order No. PSC-05-0946-FOF-TL (Fla.Pub.Serv.Comm. Oct. 3, 2005). However, it should be noted that the Florida Power and Progress Energy petitions were filed under chapter 366, Florida Statutes, and the Sprint-Florida order, which resulted from a petition filed under chapter 364, Florida Statutes, was based upon a stipulation of the parties.